James S. SCOTT, Regional Director of the Thirty–Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellant,

v.

EL FARRA ENTERPRISES, INC., d/b/a Bi–Fair Market, Respondent–Appellee.

No. 88–1821.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 9, 1988.

Decided Dec. 19, 1988.

**671**

Ellen A. Farrell, Washington, D.C., for
petitioner-appellant.

Cal B. Watkins, Fresno, Cal., for respondent-appellee.

Before WRIGHT and POOLE, Circuit
Judges, and WILLIAMS,* Senior
District Judge.

DAVID W. WILLIAMS, District
Judge:

The Memorandum of September 2, 1988,
as amended September 13, 1988, is withdrawn.

James S. Scott, Regional Director of the
National Labor Relations Board (the
Board), appeals on behalf of the Board the
denial of its petition for interim injunctive
relief under section 10(j) of the National
Labor Relations Act (the Act), 29 U.S.C.
Sec. 160(j),[1] against El Farra Enterprises,
Inc., d/b/a Bi–Fair Market (Bi–Fair). The
Board seeks an order directing Bi–Fair to
offer employment to all employees formerly employed by Mayfair Market, displacing,
if necessary, any newly hired employees
not previously employed by Mayfair and to
recognize and bargain with the United
Food and Commercial Workers Union Local
No. 1288 (Local 1288 or the union).

The district court denied a portion of the
petition after finding that the Board did not
show the requisite necessity for interim
injunctive relief. The Board contends that
the district court abused its discretion by
concluding that the Board had not convinced the court that "reasonable cause"
existed to warrant injunctive relief. We
agree, and therefore reverse the judgment
and remand the action with instructions
that the district court grant the relief
sought by the Board.

## STATEMENT OF THE FACTS

Mayfair Market operated a grocery store
at 917 East Olive Street, Fresno, California, until it was purchased by Bi–Fair in
the summer of 1987. Mayfair operated
with 27 clerk employees. For at least
twelve years prior to the sale, the clerks at
Mayfair were represented by the union in
collective bargaining. The most recent
agreement between Mayfair and the union
was effective from 1986 to 1989.

On July 20, 1987, the owners of Mayfair
informed its employees that the store
would be sold and that all of the employees
would be laid off as of August 1, 1987.
The Board alleges that attempts to ascertain from the store manager or other insiders the identity of the new owners were
futile. From July 21 to July 27, a blind ad
in the *Fresno Bee* announced that job interviews would be conducted for "cashiers,
produce, meat cutters, and stock clerks."
The ad did not name the employer. The
Mayfair employees were not specifically informed of this opportunity to make applications.

---

* The Honorable David W. Williams, Senior United States District Judge for the Central District of California, sitting by designation.

1. Section 10(j) provides:

    The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States (including the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems *just and proper.*
    29 U.S.C. Sec. 160(j) (emphasis added).

Interviews were conducted on July 25th and 26th by Larry Fellbaum, the store manager for Bi–Fair. Fellbaum interviewed over 200 applicants, only 5 of whom were Mayfair employees. The employer's identity remained undisclosed. When one Mayfair employee inquired whether the employer was the new owner of Mayfair, Fellbaum responded that it was not.[2] Fellbaum told the applicants that they would hear of his decisions by Wednesday, July 29th.

The Board contends that a bogus interview session for the receipt of applications from Mayfair clerks was scheduled (on July 31, after Bi–Fair had already hired a full complement of employees) with the foregone conclusion that no Mayfair employees would be hired. Four Mayfair employees were offered employment at positions that paid at least the equivalent of union wages. However, they were not hired either because of their written statements which expressed union loyalty and sympathy or because they requested union wages on their applications.

When entreated to hire some Mayfair employees, Fellbaum implied that the final hiring decisions were at the discretion of the owners. Several verbal skirmishes ensued concerning the hiring of Mayfair employees. At one such verbal altercation, alleges the Board, Fellbaum stated that no union members would be hired.

On August 2, 1987, Bi–Fair opened for business with a total employee complement of approximately 30 workers. None of them were former Mayfair employees. Because of this, the union began to picket the store on that day. Fellbaum threatened employees that the police would be summoned and that they would be arrested for picketing. Bi–Fair engaged in surveillance of employees' union activities by following picketers and eavesdropping on their conversations.

On September 30, 1988, the Board issued a Complaint against Bi–Fair alleging that it was violating section 8(a)(1), (3), and (5)[3] of the National Labor Relations Act, as amended, 29 U.S.C. Secs. 151 et seq. (NLRA or the Act). The Complaint alleged that Bi–Fair purchased Mayfair as a continuing enterprise,[4] but discriminatorily refused to hire Mayfair's clerk employees because they were represented by the union for the purpose of collective bargaining. The Complaint also alleged that Mayfair refused to recognize and bargain with the union as the representative of the clerk employees and unilaterally changed the clerks' preexisting employment conditions without bargaining with the union. The Complaint alleged finally that Mayfair had interfered with employees' rights to engage in lawful, peaceful picketing.

On December 16, 1987, the district court issued an order which mandated that Bi–Fair cease and desist from (a) discriminating against the Mayfair clerks and (b) interfering "in any manner" with employees' rights to picket Bi–Fair. It required Bi–Fair to give former Mayfair clerks preference in future hiring. (The order also required a posting of a copy of the court's

---

**2.** On numerous occasions, according to the Appellant, the union attempted to find out the identity of the new owners and to submit the applications of its members.

**3.** Section 8(a) of the National Labor Relations Act states in pertinent part that
It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 . . .
(2) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .
(5) to refuse to bargain collectively with the representative of his employees, subject to the provisions of section 9(a).

29 U.S.C. Sec. 151 et seq.
Section 7 of the Act states that
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

**4.** Bi–Fair then had the market's assets, goodwill and liabilities, was engaged in the same business operations, was at the same location, and was selling the same services to substantially the same customers.

order and restriction on the interference in any manner with the rights of employees to peacefully picket—neither of which are at issue in this appeal.) The Board appeals from that order.

## DISCUSSION

Although it is clear that the purpose of section 10(j) is to further effectuate the purposes of the Act, no distinct guidelines for its use are provided in its legislative history. However, case law development shows a distinct reliance on the "reasonable cause" and "just and proper" standards that are used for section 10(*1*).[5]

■ The standard that has evolved for determining whether section 10(j) injunctive relief is appropriate is a two part inquiry:

1. whether there is "reasonable cause" to believe that the unfair labor practices for which interim relief is sought have occurred [reasonable belief of the Regional Director, not the court];[6]
2. whether the relief sought is "just and proper" to preserve the Board's ability effectively to remedy the violations alleged.

*See Aguayo v. Tomco Carburetor Co.,* 853 F.2d 744, 747 (9th Cir.1988). The court is not to decide the merits of the case in the underlying labor charges or insist that the Regional Director persuade the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous.

### a. *Determining "Reasonable Cause"*

In *Kennedy v. Sheet Metal Workers Int'l Ass'n Local,* 289 F.Supp. 65 (C.D.Cal. 1968), the court held:

5. In *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138 (3d Cir.1975), the court held that *reasonable cause* to believe a violation of the act has occurred [a standard for injunctive relief originally developed in cases arising under section 10(*1*) of the Act] is also applicable to section 10(j) proceedings.

6. See *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076 (3d Cir.1984) (the Board does not have to prove, and the district court does not have to find, that unfair labor practices have occurred);

*The court's role is confined to determining whether the Regional Director has reasonable cause to believe that the Act has been violated, as alleged in his petition,* and all that requires is the prima facie establishment of the allegations of such petition. [Citing *Kennedy v. Los Angeles Joint Executive Board,* 192 F.Supp. 339, 341 (S.D.Cal.1961).] The statutory standard of "reasonable cause" is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(*l*) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence.

*Kennedy v. Sheet Metal Workers,* at 91 (emphasis added).

This circuit has articulated the policy to be followed to set aside an order granting a temporary injunction under the Act: "It must appear that the district court's finding that there was reasonable cause to believe the Act was being violated was clearly erroneous." *Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union v. Jenkins,* 308 F.2d 516 (9th Cir.1962). The court held:

The statutory standard of "reasonable cause" is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(*1*) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence. As the Court of Appeals for the Ninth Circuit stated, Section 10(*l*) embodies a "[c]ongressional policy favoring the granting of temporary injunctions." *Id.* at 517.

*Levine v. C & W Mining Co.,* 610 F.2d 432 (6th Cir.1979) (same); *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d 1047 (2d Cir.1980) (the regional director need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous); *Fuchs v. Hood Indus., Inc.,* 590 F.2d 395 (1st Cir.1979) (the First Circuit stated that in making a reasonable cause determination, neither the district court nor the appellate court are to resolve conflicts in the evidence).

In a footnote, the court stated that because of congressional policy favoring temporary injunctions under Section 10(*l*) of the Act, "we do not do limit our scope of review when an injunction is denied." *Id.* at 517 n. 1 (citing *Brown v. Pacific Telephone and Telegraph Co.*, 218 F.2d 542 (9th Cir.1954)).

In *Brown,* we pointed out that the district court erred in denying an injunction and in holding that it was "unable to find that there is reasonable cause to believe that a violation of the Act has occurred and for that reason the application for an injunction is denied and the petition is dismissed" because that decision would, in effect,

> hold that the Board's as yet untried complaint ... does not state a cause of action in its charge ... This although the Act provides that the determination of a charge of violation of the Act is for the Board itself to decide.

*Id.*

In *Kennedy v. Los Angeles Typographical Union No. 174,* 418 F.2d 6 (9th Cir. 1969), we held that a preliminary injunction should be granted if the court finds that factual allegations and propositions of law underlying the regional director's petition are not insubstantial and frivolous, so that he has reasonable cause for believing the Act has been violated, and if the court finds that injunctive relief is appropriate. In *San Francisco–Oakland Newspaper Guild v. Kennedy,* 412 F.2d 541 (9th Cir. 1969), we held that:

> All that is required under Section 10(*1* ) for a regional director to petition for such an injunction is reasonable cause to believe an unfair labor practice is being committed. The preliminary injunction should be granted by the court if the court finds that the factual allegations and the propositions of law underlying the Regional Director's petition are not insubstantial and frivolous so that he has reasonable cause for believing the Act

has been violated, and if the court finds that injunctive relief is appropriate. *Id.* at 544.[7]

b. *Determining "Just and Proper"*

Although this circuit has not delineated a definitive standard, other circuits have provided helpful analysis of the "just and proper" requirement. Most circuits have required little to meet the second step of the injunctive relief inquiry. They require only that the relief be necessary to prevent a frustration of the remedial purposes of the Act.

In *Angle v. Sacks,* 382 F.2d 655 (10th Cir.1967), the Tenth Circuit held that, "Where reasonable cause existed to believe that an unfair labor practice had occurred and purposes of the National Labor Relations Act could be defeated if some temporary relief were not granted, an injunction was a just and proper remedy," under the National Labor Relations Act.

In *Squillacote v. Graphic Arts Int'l Union, AFL–CIO,* 540 F.2d 853 (7th Cir.1976), the Seventh Circuit held that the contention that the Regional Director must establish reasonable cause as to the belief of a charge by "clear and convincing evidence" is erroneous. The court stated that the director faces a "relatively insubstantial burden of proof when he petitions a district court for temporary relief pursuant to section 10(j)." The court found that the issuance of a preliminary injunction was "within the range of rationality" and was, therefore, "just and proper." According to the court, "no other kind of relief would have given adequate recognition of the reasonable-cause-to-believe standard of section 10(*l* )."

We have recently reiterated the use of the "reasonable cause" and "just and proper" standards for review of the denial of injunctive relief. In *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir.1988), we held that the Board's burden to establish reasonable cause is minimal and that an interim remedy [reinstatement]

---

7. *See also Retail Clerks Union, etc. v. Food Employers Council, Inc.*, 351 F.2d 525 (9th Cir. 1965); *Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union, etc. v.* *Jenkins,* 308 F.2d 516 (9th Cir.1962); *Warehousemen's Union Local 6, etc. v. Hoffman,* 302 F.2d 352 (9th Cir.1962).

is "just and proper" pending Board review when the employer has acted against an employee because of union activity.

In the instant case, the Board petitioned the district court for temporary injunctive relief pursuant to section 10(j).[8] The Regional Director contended that reasonable cause to believe that El Farra engaged in unfair labor practices existed. Reasonable cause, the Board argued, can be based on Bi–Fair's successor employer status.

■ There is a broad test for determining the existence or non-existence of successorship status. It is the "substantial continuity of identity in the business enterprise." The criteria developed by the Board under the Act includes some combination of the following:

1. the same or substantially the same work ·force is employed;
2. the new employer uses the same plant;
3. there has been a substantial continuity of the same business operations;
4. the same jobs exist under the same working conditions;
5. the same supervisors are employed;
6. the same machinery, equipment, and methods of production are used; and
7. the same product is manufactured or the same services are offered.

Although having a majority of employees who are former employees of the predecessor employer is the major criterion, where a buyer has engaged in section 8(a)(3) discrimination in its hiring of employees, there is a presumption of union majority status no matter how many of the seller's employees were hired. *Karl Kallmann dba Love's Barbeque Restaurant No. 62 v. NLRB*, 640 F.2d 1094 (9th Cir.1981). In the *Kallmann* case, bargaining orders were imposed since, but for the successor's discriminatory refusal to hire the predecessor's employees, the union would have represented a majority of the successor's work force.

In *Kallmann*, employees of the predecessor, who had a bargaining agreement, were given inadequate notice of the change in ownership of the business; they were surreptitiously kept from applying for or participating in interviews for employment. The few who did apply were turned down. The union picketed the business. During the picketing, Kallmann took pictures of the picketing employees and discussed hiring a few of them if they would forsake the union.

The Board held that Kallmann was a successor employer even though none of his employees had been employed by his predecessor, he had very few applications from former employees, and he had made some changes to the business. The court agreed that he had violated sections 8(a)(1) and (5) as a successor employer by refusing to recognize and bargain with the union, which, it was presumed, would have had majority support but for Kallmann's discriminatory conduct. The employer also violated the Act by his comments about not wanting a union shop and by photographing the picketing employees, which was intimidating and a harassment of union members.

Kallmann's hiring procedures were scrutinized by the court and found to be remiss. His procedures, the court said, may have been designed to conceal the availability of jobs from former unionized employees. The court declared that an employer would not be permitted to rely on its own wrongdoing when it chose to preclude union employees from applying for positions, and the appropriate remedy was *reinstatement of the predecessor's employees*. *Kallmann*, 640 F.2d at 1101 (emphasis added).[9]

In the instant case the district court, in granting the Board's petition for a temporary injunction, held that:

---

**8.** The court stated in its Findings of Fact that, "Although the evidence is conflicting on this point, the Regional Director has established that he has reasonable cause to believe the Respondent's activity was motivated because of the employees' union membership."

**9.** Where the employer has made anti-union statements, the Board has held that it cannot rely on a low number of job applications to rebut the presumption. The appropriate remedy in such a case is reinstatement of all former employees. *NLRB v. Tragniew, Inc.*, 185 NLRB 962 (1970), 470 F.2d 669 (9th Cir.1972).

There is reasonable cause to believe that El Farra Enterprises, Inc., dba Bi–Fair Market, has engaged in, and is engaging in, acts and conduct in violation of section 8(a)(1), and (3) and (5), affecting commerce within the meaning of section 2(6) and (7) of the Act [29 U.S.C. Sec. 152(6) and (7) ], and that such acts and conduct will likely be repeated or continued unless enjoined. (ER 248)

The injunction proscribed Bi–Fair's hiring practices and its treatment of former Mayfair employees. (ER 248, 249) It directed Bi–Fair to:

a) offer all employees formerly employed by Mayfair Markets in the Unit as of the date such positions became [sic] available, including but not limited to the employees named in paragraph 1(a) above, full and immediate reinstatement to their former positions *under such terms and conditions that may be mutually agreed upon by Respondent and each employee,* and without prejudice to seniority or other rights which they enjoyed, displacing, if necessary, any newly hired employees not previously employed by Mayfair ... (ER 250) (Emphasis added.)

In its Findings of Fact and Conclusions of Law, the district court presented the following pertinent facts:

1. Bi–Fair's conduct was motivated by anti-union animus. (ER 257)

2. Bi–Fair had failed to offer the Mayfair employees employment [although the court states that the evidence is in conflict on this point, case law strongly supports the acceptance of the Board's contention]. (ER 259)

3. Bi–Fair had harassed, threatened, and intimidated the Mayfair employees in their union activities. (ER 259)

4. Based on Bi–Fair's actions, it is appropriate, just and proper to grant the temporary injunction.

Furthermore, Bi–Fair openly discouraged applications from the Mayfair employees by refusing to apprise them of their inter-

viewing schedule, the identity of the new owners, and through rumor and poor communication. When the Mayfair employees requested information about continuing their employment, they were constantly met with derision.

■ The facts in this case closely resemble the facts in cases in which this circuit set forth standards of successorship, majority status, union responsibility, and the impact of discriminatory practices. Despite the district court's factual findings, it failed to apply this circuit's analysis granting relief. That is, after finding *reasonable cause* to believe that the unfair labor practices had occurred [10] and that temporary injunctive relief would be *just and proper* to prevent further acts pending the Board's review, the court stated that the Board had not met its burden of proof because its evidence had not convinced *the court.* (ER 274)

The court found lacking the Board's use of only affidavits instead of live testimony and spoke of "preponderance of the evidence" (ER 260) as if it were undertaking a full review, which is inconsistent with the language of section 10(j) and pertinent caselaw. Finally, the court did not acknowledge the successor employer status which imposed a duty on Bi–Fair to bargain with the displaced union in good faith. The Board's reasonable cause to believe that unfair labor practices had occurred was in part predicated on Bi–Fair's successor employer status.

The district court's order was an abuse of discretion because it did not require Bi–Fair to immediately hire the employees and then bargain with their representatives as this circuit has steadily held must be done. The district court must grant relief consistent with the statutory purposes of the Act. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416–17, 95 S.Ct. 2362, 2370–71, 45 L.Ed.2d 280 (1975). After acknowledging the need for relief, the district court must, with great deference to the expertise of the

---

**10.** (A higher standard than the Ninth Circuit standard that only the *Regional Director* needs

to believe that there is reasonable cause.)

Board, grant a "just and proper" remedy. Accordingly, we remand the action with instructions that the district court grant the relief petitioned for by the Board.

## CONCLUSION

The district court's judgment is REVERSED. We remand to the district court for an order granting the Board's section 10(j) petition for interim relief in its entirety.