ORDER
 

 THELTON E. HENDERSON, Chief Judge.
 

 James Scott, Regional Director of the National Labor Relations Board (NLRB), petitions this Court for a temporary injunction pursuant to Section 10® of the National Labor Relations Act (NLRA), as amended, 29 U.S.C. § 160®. For the reasons stated below, this Court GRANTS the petition.
 

 FACTUAL BACKGROUND
 

 Port Costa Materials was previously a subsidiary of PLA Holdings, Inc. (PLA), and was the only unionized PLA facility. Although the Port Costa facility operated as a brick plant until 1991, at the time of the TXI acquisition, Port Costa produced lightweight aggregate and did some soil remediation work. Allen Dec. ¶¶ 2, 93. Most Port Costa employees had over five years experience, and some had well over twenty years with the company. Aff. at 134,195,197.
 

 The Port Costa employees were jointly represented by International Longshoremen’s and Warehousemen’s ■ Union Local 6, International Longshoremen’s and Ware-housemen’s Union Local 17, and the Warehouse Council IBT-ILWU (called collectively the Union). At the time of Port Costa Material’s closure, a contract effective through May 31,1998 covered thirty union employees at the facility. Silveira Aff. at 2, 21-57. Only two Porta Costa maintenance employees could be excluded from the bargaining unit, pursuant to this contract. Silveira Supp.Aff. at 348-49.
 

 In early 1995, Texas Industries, Inc. (TXI) began exploring the possibility of acquiring the Port Costa Materials facility. Although Port Costa Materials was losing about $1 million a year, TXI decided to purchase the facility. Lieber Dec., Exh. A at 1110-11. On November 19, 1995, TXI began running advertisements in the San Francisco Chronicle soliciting applications for production, maintenance, and office positions at the Port Costa facility. Allen Dec. ¶ 5; Aff. at 58,
 
 *1448
 
 266. Port Costa employees shortly thereafter were told to fill out employment applications for TXI. Every employee submitted an application. Silveira Aff. at 4-5. Mr. Allen reviewed approximately eighty applications which came in as a result of these ads, and forwarded 12-15 of them to TXI’s regional operations manager. Allen Dec. ¶ 5. TXI advised the outside applicants that they would be considered at a later time. Allen Aff. at 266.
 

 About the same time, TXI vice-president Mel Brekhus came to the Port Costa facility and responded to questions raised about the Union by stating that the facility would not have a union. Aff. at 105, 113. Then, TXI interviewed all of the clerical employees, who were non-union, and offered them jobs. Aff. at 106. Lee Allen was also offered the position of plant manager, which he accepted a few days later. Allen Aff. at 249.
 
 [1]
 

 On January 22,1996, Pacific Custom Materials, Inc. (Pacific Custom) purchased the assets of Port Costa Materials and took over the business operations of the facility. Port Costa employees were advised to come in and pick up their final paychecks. Aff. at 5, 174. Mr. Allen again gave assurances to employees that they would be returning to work at the facility. Aff. at 5, 174, 212.
 

 Some former Porta Costa employees had already been hired and had started working for Pacific Custom. For example, TXI interviewed the two union-exempted mechanics— Mr. Jasso and Mr. Rudy — in October 1995, before union employees were even asked to submit employment applications. Silveira Aff. at 5. Mr. Jasso and Mr. Rudy’s date of hire was January 23,1996. Allen Aff. at 343. Other nonunion employees — such as quality control officers Steve Johnson and Caine Lai, seeurity/janitor Stanford Koch, and three clerical employees — were also hired as of January 23, 1996. Allen Dec. at ¶ 6; Allen Aff. at 343.
 

 About this same time, TXI began interviewing the unionized Port Costa employees. During these interviews, Gordon Yonz, TXI’s Human Resources Administrator, told employees that TXI did not have any unionized plants. Yonz Dee. at ¶ 24. Although he denies saying more, many former Port Costa employees also recall Mr. Yonz stating that the Pacific Custom employees would not have a union. Aff. at 119, 126-27, 137, 151, 169, 175,192,199, 204, 235, and 240. Finally, Mr. Yonz allegedly told employees that, if hired, Respondent wanted them to work for several months without a union. Aff. at 119, 199, 204, 235.
 

 Gary Silveira, a long-time Port Costa unionized maintenance mechanic, was hired by Respondent, and he went to the facility on February 9th for an orientation and to perform electrical work. He spoke to Steve Johnson, a nonunion Port Costa quality control officer who Respondent hired to be the production supervisor, about whether or not Pacific Custom could begin operations due to electrical problems that existed. In reply, Mr. Johnson stated that electrical problems were nothing compared to trying to start up the facility with “60% new people.” Aff. at 7-8.
 
 [2]
 
 An office employee, Gina Benevidez, also recalled Mr. Allen stating that he could only hire a certain amount of ex-employees because TXI was afraid they would vote in the Union. Aff. at 108.
 

 Unsatisfied with the number of applications, Pacific Custom placed a second round of ads in the Contra Costa Times in early February. Yonz Dec. at ¶ 15. Respondent also contacted the Mare Island Re-Employment Center and the Employment Development Department in Pleasant Hill, asking each of them to put job descriptions on their
 
 *1449
 
 computer networks. Yonz Dec. at ¶ 13. TXI received over 200 applications as a result. Allen Dec. ¶ 6. Mr. Allen prescreened these outside applications for “experience, aptitude and other qualifications required by TXI, such as cross-training ability, attitude and working as member [sic] of a team.” Aff. at 266. He forwarded promising applications on to TXI’s Human Resources Department, which conducted the initial interviews. Yonz Dee. ¶ 18.
 

 On February 23, 1996, Respondent began operations at the Port Costa facility. Allen Dec. at ¶ 13. By March 1, 1996, Pacific Custom had thirty-four employees — nineteen new hires and fifteen former employees. Allen Dec. at ¶ 13. The former employees working for Respondent included the two union-exempt mechanics. Although former Port Costa employees received comparable wages, their health, retirement, and pension benefits were substantially different. Aff. at 7, 21-57, 59-81. Respondent made these changes to the terms and conditions of employment without prior notice to the Union. The Union has made a formal demand for recognition and bargaining, but Pacific Custom has not responded. Aff. at 352.
 

 Respondent did not hire sixteen former Port Costa employees who were active union members. These employees have either not been given a reason for not being hired back or been told that other applicants had more experience or skills. Aff. at 127,137,175-76, 193, 212. In comparison with other nonunion facilities which TXI acquired at the same time, TXI rehired 14 Ridgelite Plant employees after receiving 109 applications. Yonz Dec. at ¶ 5 & 10. All 3 employees at the non-union Olancha Plant were rehired after TXI received 5 applications. Yonz Dec. at ¶ 6 & 9.
 
 [3]
 

 DISCUSSION
 

 In order to prevent parties from frustrating the purposes of the NLRA during the pendency of protracted proceedings before the NLRB, Congress passed Section 10(j), which states as follows:
 

 The Board shall have power, upon issuance of a complaint ... charging that any person has - engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 

 29 U.S.C. § 160(j). Any injunctive relief which a district court might order pursuant to this section lasts only until the NLRB renders its final decision on a complaint issued by the Board’s General Counsel.
 
 Sears, Roebuck & Co. v. Carpet, etc., Layers Local 419, AFL-CIO,
 
 397 U.S. 655, 657-59, 90 S.Ct. 1299, 1301, 25 L.Ed.2d 637 (1970).
 

 The Ninth Circuit has directed district courts to apply traditional equitable criteria in determining whether relief is “just and proper.”
 
 Miller v. California Pacific Medical Center,
 
 19 F.3d 449, 459 (9th Cir. 1994) (en banc). This analysis involves consideration of: 1) the public interest in ensuring that unfair labor practices do not undermine the NLRA simply because the Board takes too long to investigate and adjudicate the charge; 2) a likelihood of success on the merits, which at a minimum should involve a fair chance of success and serious questions going to the merits of the case; and 3) the possibility of irreparable injury or that the balance of hardships tips decidedly in Petitioner’s favor.
 
 Id.
 
 at 460.
 

 A
 
 The Public Interest
 

 The first factor this Court must consider is the public interest in ensuring that unfair labor practices do not undermine the NLRA simply because the Board takes a long time to investigate and adjudicate the
 
 *1450
 
 charge.
 
 Miller v. California Pacific Medical Center,
 
 19 F.3d 449, 460 (9th Cir.1994).
 

 On February 28,1996, the Union filed with the NLRB this charge against Respondent, alleging violations of NLRA §§ 8(a)(1), (3), and (5). The NLRB began an investigation, and its General Counsel eventually filed a complaint on April 30, 1996. Although the hearing stage will be completed in the next several weeks, Petitioner has represented that “it is likely that the administrative law judge will not issue his decision for at least another three or four months.” Petitioner’s Reply at 7. If Petitioner prevails and Respondent appeals the decision, it could be several more months before the Board issues a final determination. The Ninth Circuit also has noted that “[njormally there is a significant delay before the Board issues its ruling in an unfair labor practice proceeding.”
 
 Aguayo for NLRB v. Tomco Carburetor Co.,
 
 853 F.2d 744, 747 (9th Cir.1988),
 
 overruled on other grounds by Miller,
 
 19 F.3d 449. Under such circumstances, the public’s interest in ensuring that unfair labor practices do not continue while the NLRB makes a decision weighs in favor of granting the temporary injunction.
 

 B. Likelihood of Success on the Merits
 

 This factor requires that Petitioner, at a minimum, show a fair chance of success and serious questions going to the merits of the case.
 
 Miller,
 
 19 F.3d at 460. While the NLRB has the burden of establishing that it meets these criteria, the district court should keep in mind its own lack of jurisdiction over unfair labor practices and the deference accorded to NLRB determinations by the appellate courts.
 
 Id.
 
 According to the Ninth Circuit, this means that “the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.”
 
 Id.
 

 1. Interference with the Right to Organize
 

 The NLRA proscribes an employer from interfering with, restraining, or coercing employees in the exercise of their rights under the Act. 29 U.S.C. § 158(a)(1). One right that the NLRA confers upon workers is the right to organize unions and bargain collectively. 29 U.S.C. § 157.
 
 [4]
 

 Ordinarily, an employer’s statement that it will not have a union does not violate section 8(a)(1).
 
 Williams Enterprises, Inc. v. N.L.R.B.,
 
 139 LRRM 2626, 2632, 956 F.2d 1226 (D.C.Cir.1992). However, potential successor employers do violate NLRA section 8(a)(1) when they state during preemployment interviews that the successor’s operation will be non-union because these statements have “a reasonably foreseeable coercive impact.”
 
 Royal Midtown Chrysler Plymouth, Inc.,
 
 133 LRRM 1165, 1165 n. 4, 1989 WL 224383 (1989). The D.C. Circuit court has also found that a coercive message is sent when an employer tells applicants at a meeting that the company will be non-union before it hires its employees.
 
 Williams Enterprises,
 
 139 LRRM at 2632, 956 F.2d at 1234. This message “indicates to the applicants that [the employer] intends to discriminate against [them] to ensure its nonunion status.”
 
 Id.
 
 (quoting
 
 Kessel Food Markets, Inc.,
 
 130 LRRM 1165, 1987 WL 90101 (1987),
 
 enfd
 
 868 F.2d 881 (6th Cir.1989),
 
 cert. denied
 
 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43).
 

 These decisions seem limited to cases in which the employer may face successor status.
 
 See Williams Enterprises,
 
 139 LRRM at 2632, 956 F.2d at 1234 (distinguishing case finding no violation of 8(a)(1) because the employer knew it would never reach successor status). The NLRB considers a new employer to be a “successor” when there is a “substantial continuity of identity in the business enterprise.”
 
 John Wiley & Sons v. Livingston,
 
 376 U.S. 543, 551, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964). In determining whether substantial continuity exists, the Board will have to examine a number of factors, including: 1) whether the business of both employers is essentially the
 
 *1451
 
 same; 2) whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and 3) whether the new entity has the same production process, produces the same products, and basically has the same body of customers.
 
 Fall River Dyeing & Finishing Corp. v. N.L.R.B.,
 
 482 U.S. 27, 43-44, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). A finding of substantial continuity also “necessarily includes ... a substantial continuity in the identity of the work force across the change in ownership.”
 
 Howard Johnson Co., Inc. v. Detroit Loc. Jt. Ex. Bd., etc.,
 
 417 U.S. 249, 263, 94 S.Ct. 2236, 2244, 41 L.Ed.2d 46 (1974).
 

 Respondent argues that the facility’s business and product production has changed in that the “major emphasis” has shifted from soil remediation to the production of lightweight aggregate. P & A in Response to Pet. at 8. The former owner’s Income Statement, however, shows that the remediated soil business accounted for only twenty percent of Port Costa’s 1995 revenues.
 
 [5]
 
 The remaining 80% of revenues was derived from sales of lightweight aggregate, which Pacific Custom also produces. Lieber Dec. Exh. A at 1111-12 and Exh. E. Furthermore, Pacific Custom continues to do soil remediation work and will not get out of this business for another three years. Lieber Dec., Exh. A at 1150-51. These facts indicate that the business of both employers is essentially the same and that the employees continue to produce the same product.
 

 Other similarities between the operation of Port Costa and Pacific Custom exist. Lee Allen served and continues to serve as plant manager, overseeing the operation of the facility. Aff. at 249. While Respondent has plans to increase its customer base, at present sixty percent of its customers were former customers of Port Costa Materials. Chabon Dee. Exh. E. Pacific Custom has not added any new equipment to the facility. Chabon Dec. Exhs. A at 234 & B at 206. Lightweight aggregate is produced in essentially the same manner under Pacific Custom’s ownership, so that job skills have not significantly changed. Chabon Dec. Exh. C at 1241. These similarities indicate that Respondent would have faced suecessorship status if Pacific Materials additionally had a substantially continuity in workforce.
 

 As for the continuity of the workforce factor, the issue under section 8(a)(1) analysis is whether at the time the antiunion statements were made, the
 
 possibility
 
 that a majority of the new workforce would be union members existed.
 
 Williams Enterprises,
 
 139 LRRM at 2632, 956 F.2d at 1234. By March 1, 1996, Respondent had hired 34 employees. Allen Dee. at ¶ 13. Most, if not all, of Port Costa’s 32 former employees had submitted an application for employment by Respondent. Aff. at 4-5. Thus, the possibility existed that Pacific Custom would have ultimately become a successor employer.
 

 Because Pacific Custom faced successor status depending upon the continuity of its workforce, this Court must next decide if Respondent indicated to applicants that the company would be non-union. The affidavit testimony from former Port Costa employees seems overwhelming. When TXI vice-president Mel Brekhus first came to the Port Costa facility and responded to questions raised about the Union, he indicated that the facility would not have a union. Aff. at 105, 113. During employment interviews, Gordon Yonz, TXI’s Human Resources Administrator, told former Porta Costa employees that TXI did not have any unionized plants, Yonz Dee. at ¶24, and that the Pacific Custom employees would not have a union. Aff. at 119, 126-27, 137, 151, 169, 175, 192, 199, 204, 235, and 240. Mr. Yonz also told employees that, if hired, Respondent wanted them to work for several months without a union. Aff. at 119, 199, 204, 235.
 

 Based upon this evidence, the NLRB has clearly met the minimum requirement of producing some evidence to support the unfair labor practice charge, together with an arguable legal theory. Hence, the Regional Di
 
 *1452
 
 rector has met his burden of establishing a fair likelihood of success on the merits of the section 8(a)(1) claim.
 

 2. Discrimination on the Basis of Union Membership
 

 Section 8(a)(3) of the act prohibits “discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization____” 29 U.S.C. § 158(a)(3). Petitioner alleges that Respondent did not to hire former Port Cos-ta employees in order to avoid successor status and the resulting obligation to bargain with the Union.
 

 The U.S. Supreme Court has held that the NLRB may compel a successor employer to arbitrate with a union.
 
 John Wiley & Sons v. Livingston,
 
 376 U.S. 543, 550-51, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964). Because an employer may not discriminate in the hiring or retention of employees on the basis of union membership, 29 U.S.C. § 158(a)(3), “a new owner cairnot refuse to hire the employees of his predecessor solely because they were union members or to avoid having to recognize the union.”
 
 Id.,
 
 417 U.S. at 262, 94 S.Ct. at 2243 n. 8;
 
 see N.L.R.B. v. Burns International Security Services,
 
 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1579 n. 5, 32 L.Ed.2d 61 (1972). Thus, to prevail on the § 8(a)(3) claim, Petitioner would have to convince the Board that Pacific Custom refused to hire more than a certain percentage of former Port Costa employees because they were union members and the company was trying to avoid having to recognize the union.
 
 [6]
 

 This burden does not require that the NLRB conclusively show that every decision not to hire a former employee was motivated by union status. The Ninth Circuit, in affirming an NLRB decision, stated that “[w]here, as here, a successor employer unlawfully discriminates in hiring, an appropriate remedy is reinstatement for
 
 all
 
 the former employees.”
 
 Kallmann v. N.L.R.B.,
 
 640 F.2d 1094, 1100 (9th Cir.1981) (emphasis added).
 
 [7]
 
 In a NLRB decision, the Board stated that “once a discriminatory scheme is demonstrated, all the predecessor’s employees are 8(a)(3) diseriminatees, and there is a presumption that, but for the discrimination, a majority would have survived.”
 
 Kessel Food Markets,
 
 287 NLRB 426, 430, 1987 WL 90101 (1987). Accordingly, this Court may issue a temporary injunction requiring Pacific Custom to hire back former Port Costa employees if the NLRB provides “some evidence” to support the charge that Pacific Custom discriminatorily decided not to hire union employees to avoid a substantial continuity — i.e. a majority of former employees who were union members — between the Port Costa workforce and the Pacific Custom workforce.
 

 Petitioner first presents evidence of Pacific Custom’s and TXI’s “general antipathy towards unions” in support of its arguable legal theory that Respondent’s hiring decisions were improperly based on union membership. This Court has recounted affidavit testimony of these antiunion statements in the discussion of § 8(a)(1) violations above.
 
 See
 
 section B.l,
 
 supra.
 
 Petitioner also points to Respondent’s early hiring of non-union employees at Port Costa, as well as the hiring practices at other non-union PLA facilities which TXI acquired at the same time. As mentioned above, TXI interviewed two union-exempted mechanics — Mr. Jasso and Mr.
 
 *1453
 
 Rudy — in October 1995, before union employees were even asked to submit employment applications. Aff. at 5. Respondent hired Mr. Jasso and Mr. Rudy, as well as the remaining six other nonunion employees, as of January 23, 1996. Aff. at 343. At other non-union operations which TXI acquired in early 1996, TXI rehired 17 of the 19 Ridgelite Plant employees and all 3 Olancha Plant employees. Aff. at 246. These differences are evidence of a discriminatory motive.
 
 N.L.R.B. v. Foodway of El Paso,
 
 496 F.2d 117, 119-20 (9th Cir.1974). The Regional Director thus has succeeded in providing some evidence to show that Respondent’s hiring process was tainted by antiunion animus, a point which Respondent itself has conceded for the purposes of this proceeding.
 
 See
 
 P & A in Response to Pet. at 8.
 

 An employer may overcome a prima facie ease of a tainted hiring process by showing that it would have made the same decisions absent animus.
 
 N.L.R.B. v. Transportation Management Corp.,
 
 462 U.S. 393, 402-04, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983). To overcome the prima facie case, the employer bears the burden of persuasion.
 
 Id.
 
 (“It is fair that [the employer] bear the risk that the influence of legal and illegal motives cannot be separated, because [the employer] knowingly created the risk and because the risk was created not be innocent activity but by his own wrongdoing.”)
 

 Respondent asserts that it would not have hired the former Port Costa employees absent antiunion animus because the new employees are better qualified. Relying largely upon the fact that the new employees have higher levels of education — high school degrees and college credits — Respondent asserts that its new employees are simply better qualified for the Pacific Custom jobs. In the same breath, however, Respondent states that lightweight aggregate production is not at “the realm of rocket science.” P & A in Response to Pet. at 13-14. Not only does this statement seem to denigrate the work experiences of its own employees, but also it undercuts Respondent’s claims that a high school or college education actually improves the facility’s workforce.
 

 At oral argument, Respondent admitted that education levels were not directly relevant to job qualifications. Nevertheless, Respondent claimed that a higher education evinced a desire to learn new skills and an “inquiring mind.” Respondent has produced no evidence demonstrating that individuals with a high school degree or college education are more likely to have an “inquiring mind” than individuals lacking a formal education.
 

 This Court has similar concerns regarding Respondent’s representation that other skills — such as the ability to read blueprints or having worked at military facilities— makes an employee more qualified to work at the Pacific Custom facility. Respondent leaves it to the Court’s speculation why working on submarines or weapons systems makes an applicant better qualified for undertaking the production of lightweight aggregate. Although Respondent states that it needs workers with the ability to “operate, maintain, or even repair” plant equipment, Respondent does no more than make blanket assertions that “the overall characteristics of the work force would have to be altered” in order to accomplish these legitimate business objectives. P & A in Response to Pet. at p. 14. Without adequate explanations why the former Port Costa employees would be unable to perform the new tasks of maintaining and repairing machinery, or why every new employee would need such skills, this Court cannot find that Respondent has met its rebuttal burden.
 
 [8]
 

 Although comparing and contrasting the attributes of each old and new employee is unnecessary,
 
 [9]
 
 providing a few examples illus
 
 *1454
 
 trates how Respondent has failed to adequately rebut the prima facie case of discriminatory hiring. Respondent points to new employee Robert Cousart as an example of one of its outstanding new hires. Mr. Cousart was apprenticed as a marine machinery mechanics between 1968 and 1972. Lieber Dec., Exh. F at 1335-36. He was employed for twenty-two years at the Mare Island Naval Shipyard, where he did mechanical work weapons launching systems.
 
 Id.
 
 at 1334r-36. As a lead worker, he trained new employees in Naval procedures and safety practices.
 
 Id.
 
 at 1336-37. Mr. Cousart received many commendations for his work.
 
 Id.
 
 at 1338.
 

 At Pacific Custom, Mr. Cousart works as a general plant helper.
 
 Id.
 
 at 1342. Interestingly, Mr. Cousart was not initially hired by Pacific Custom.
 
 [10]
 
 Lieber Dec., Exh. F. at 1344. This fact undermines Respondent’s assertion that its new employees were hired on the basis of their outstanding skills. Even overlooking this fact, however, Pacific Custom still has failed to rebut a prima facie case of antiunion animus in the hiring process. While this Court acknowledges the impressive credentials of Mr. Cousart in the marine machinery mechanics field, Pacific Custom is not in the marine machinery business. The Court presumes that some skills carry over, but Respondent has not presented evidence of the degree of similarity between marine machines and the machinery at Pacific Custom.
 

 Respondent’s attempt to rebut the prima facie ease of section 8(a)(3) discrimination also falters when one considers the abilities and skills of the former Port Costa employees. For example, Respondent asserts that it did not hire Estrellita Lewis due to her lack of a college education and “because she did not have the same cross-training ability as new employees, nor did her skills and abilities equal theirs.” P & A in Response to Pet. at 22;
 
 see
 
 Allen Dec. at ¶49.
 
 [11]
 
 The evidence, however, shows that Ms. Lewis was able to work as a prep plant operator, lab technician, general laborer, bobcat operator, forklift operator, quarry operator, and paint operator. Aff. at 172. Respondent does not explain how, in light of the breadth of Ms. Lewis’ work experience, she is lacking in cross-training ability. Respondent is similarly vague about how Ms. Lewis’ skills and abilities are lacking.
 

 In light of Respondent’s failure to explain how the skills of its new employees are relevant to the work undertaken at the Pacific Custom facility, and given a related failure to detail what concrete skills former Port Costa employees lack which preclude them from employment, this Court finds that Petitioner has shown a likelihood of success on the merits of its ease: Petitioner has presented some evidence and an arguable legal theory to support its position.
 

 8. Refusal to Bargain with the Union
 

 The NLRA also prevents an employer from refusing “to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.” 29 U.S.C. § 158(a)(5). Section 159(a) provides that “Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining____” Because the NLRA imposes a duty to bargain with the representative of a majority of the employees in an appropriate unit, the initial issue is whether the charging union was such a bargaining representative.
 

 In cases involving “successor employers,” the Section 8(a)(5) duty to bargain attaches only when there is a “substantial
 
 *1455
 
 continuity of identity in the business enterprise.”
 
 Howard Johnson Co., Inc. v. Detroit Loc. Jt. Ex. Bd., etc.,
 
 417 U.S. 249, 259, 94 S.Ct. 2236, 2241-42, 41 L.Ed.2d 46 (1974). Generally, this requires that the new employer conduct essentially the same business as the former employer and hires a majority of the old employer’s work force.
 
 N.L.R.B. v. Burns International Security Services, Inc.,
 
 406 U.S. 272, 277-82, 92 S.Ct. 1571, 1577-79, 32 L.Ed.2d 61 (1972). However, when an employer discriminates in hiring on the basis of union status, the NLRB may properly assume that a majority of employees would have survived the takeover but for the new employer’s discrimination, and thus that the new employer is a successor employer.
 
 Kallmann v. N.L.R.B.,
 
 640 F.2d 1094, 1101 (9th Cir.1981).
 

 As discussed in Section B.2
 
 supra,
 
 the Petitioner has presented some facts and an arguable legal theory regarding Respondent’s illegal discrimination in hiring, so the next stage of inquiry concerns whether or not respondent refused to bargain with the Union. Petitioner argues that Respondent, as a successor employer, has refused to bargain with the Union and has unilaterally changed the terms and conditions of employment at the Pacific Customs facility. While a successor employer ordinarily may set initial hiring terms without bargaining with the incumbent union, when this employer hires or should have hired substantially all of the former employees, “the successor must consult with the union before altering the terms and conditions of employment.”
 
 Kallmann v. N.L.R.B.,
 
 640 F.2d 1094, 1102-03 (9th Cir.1981).
 

 Respondent does not deny that Pacific Custom failed to consult with the Union before altering the terms and conditions of employment. Thus, because there is a fair chance of Petitioner’s success in showing that Pacific Custom is a successive employer and failed to consult with the Union before altering the terms and conditions of employment, Petitioner has met its burden of demonstrating a fair chance of success on the issue of Respondent’s violation of NLRA Section 8(a)(5).
 

 C. Possibility of Irreparable Injury
 

 In the Ninth Circuit, a district court may presume irreparable injury if Respondent concedes the substance of the charge or if the Board demonstrates a strong likelihood that it will prevail on the merits. However, if the charge is disputed or the Board has only a fair chance of success, the court must consider the possibility of irreparable injury.
 
 Miller,
 
 19 F.3d at 460. Respondent has not conceded the substance of the charge, so this Court will examine the possibility of irreparable injury to the moving party if relief is not granted. Alternatively, Petitioner must show that the balance of hardships tips decidedly in its favor. In undertaking these analyses, “the district court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board’s remedial authority.”
 
 Miller,
 
 19 F.3d at 460.
 

 Petitioner has submitted a proposed temporary injunction order that would require Respondent to “cease and desist” from performing certain illegal acts as well as to affirmatively act in the following manner: 1) reinstating twelve former employees of Port Costa Materials; 2) bargaining with the Union as the exclusive eohective-bargaining representative; 3) restoring the previous terms and conditions of employment until the parties can bargain in good faith to an agreement; 4) posting copies of the temporary injunction; and 5) submitting a sworn affidavit describing compliance with the temporary injunction.
 

 The remedial authority of the NLRB will undoubtedly be undermined if the temporary injunction is not granted. Because the workers will not be able to delay a job search for an extensive period of time while the NLRB is reaching a decision, an eventual Board decision against the Respondent will be meaningless because the remedy of reinstatement will not likely be carried out. Studies have shown a significant decline in the proportion of discriminatees accepting reinstatement when offered more than six months after a discriminatory discharge or refusal to hire.
 
 See
 
 Paul Weiler,
 
 Promises to Keep:
 
 
 *1456
 

 Securing Workers’ Rights to Self-Organization Under the NLRA,
 
 96 Harv.L.Rev. 1769, 1792-93 (1983). With the union majority expelled from the workplace, the employer will have effectively removed the union from the facility.
 

 Respondent argues that Petitioner’s delay in seeking a temporary injunction implies a lack of urgency and irreparable harm. Indeed, the Ninth Circuit has held that under Section 10(j), delay is “significant if ... the Board’s final order is likely to be as effective as an order for interim relief.”
 
 Aguayo for N.L.R.B. v. Tomco Carburetor Co.,
 
 853 F.2d 744, 750 (9th Cir.1988),
 
 overruled on other grounds by Miller,
 
 19 F.3d 449. Because the Board has not unreasonably delayed in filing the temporary injunction and, as discussed in section A,
 
 supra,
 
 the NLRB will likely take many months to issue a final order, this Court finds that the four month delay in seeking a temporary injunction does not undermine the independent im- . portance of any interim order.
 

 One condition within the proposed injunction worth noting concerns the requirement that Respondent restore the previous terms and conditions of employment. The Ninth Circuit has held that injunctive relief is “just and proper” under section 160(j) when the relief is “necessary to prevent a frustration of the remedial purposes of the Act.”
 
 Scott v. El Farra Enterprises, Inc.,
 
 863 F.2d 670, 674 (9th Cir.1988). The U.S. Supreme Court has noted that the existence of a bargaining obligation does not compel an employer to issue any particular contract,
 
 N.L.R.B. v. Burns International Security Services, Inc.,
 
 406 U.S. 272, 281, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972). Thus, the reinstatement of former terms and conditions would seem to be inconsistent with the remedial purposes of the NLRA.
 

 The Petitioner argues that the Ninth Circuit has approved of injunctions requiring the interim reinstatement of the previous contract pending the commencement of bargaining between the union and the employer.
 
 Scott v. El Farra Enterprises, Inc.,
 
 863 F.2d 670 (9th Cir.1988). However, the text of this decision does not approve of any such remedy. In fact, the
 
 Scott
 
 court ordered the district court to grant an injunction which stated that the successor employer must reinstate employees to “their former positions
 
 under such terms and conditions that may be mutually agreed upon by Respondent and each
 
 employee----”
 
 Scott,
 
 863 F.2d at 676 (emphasis in text). In light of the fact that the NLRA does not compel an employer to issue any particular contract, the proposed temporary injunction provision which requires Pacific Custom to reinstate the terms and conditions of the Port Costa employment contract do not appear to be just and proper. Accordingly, this Court will not issue such an injunctive provision.
 
 [12]
 

 The removal of this injunctive provision also causes the balance of hardships to tip decidedly in favor of the Petitioner. As discussed above, the injunction is necessary to protect the remedial purposes of the NLRA and preserve the authority of the NLRB. Additionally, the grant of an injunction will prevent further harm to the Union and its members who were likely wronged by Respondent’s acts.
 

 Respondent may suffer some harm in having to train workers in some new operating procedures and through the loss of the opportunity to rehire the new employees who replaced the former Port Costa workers.
 
 [13]
 
 However, the employees which will be rein
 
 *1457
 
 stated through the injunction are experienced workers, and the evidence shows that many of them have strong records at Port Costa. Because the temporary' injunction does not require Respondent to fire any particular employees, Mr. Allen’s assertion that the company will lose $150,000 a year in having to contract out its maintenance work is without merit.
 
 See
 
 Allen Dec. at ¶91. Respondent is not precluded from making any economically rational choice regarding which of the new hires will remain in the two or three additional positions Pacific Custom has added since taking over the facility. The Court also notes that the cease and desist portions of the injunction merely require Respondent to obey the law, and thus does not burden the Respondent with any hardship unique to the injunction. Hence, this Court also finds that the balance of hardships tips decidedly in favor of the NLRB.
 

 CONCLUSION
 

 Petitioner has met its burden of establishing “some evidence and an arguable legal theory” as well as irreparable injury if the injunctive relief is not granted. This Court concludes that injunctive relief is necessary to prevent further possible violations of NLRA sections 8(a)(1), (3), and (5). Accordingly, and for good cause showing, the Court ORDERS the following:
 

 Pending the Board’s final disposition of this matter, Respondent, its officers, representatives, agents, servants, employees, and all persons acting on its behalf áre enjoined and restrained from 1) stating to prospective and current employees that Pacific Custom will not be -unionized and that employees cannot be union; 2) asking potential or current employees if they have a problem with the Respondent’s union stance; 3) attempt ing to avoid unionization by withholding employment offers from Donald Davis, Lucio Gutierrez, Steven Thomas, Horacio (Ray) Villalobos, David Sehelhorn, Roberto Esparza, Julian Silva, Estrellita Lewis, Danny Smith, and Jesus Esparza; 4) failing or refusing to recognize or bargain with the Union as the exclusive collective bargaining representative of its production and maintenance employees; and 5) interfering with or restraining employees in the exercise of their Section 7 rights.
 

 Pacific Custom Materials is also directed to undertake the following actions: 1) reinstate the above named former employees of Port Costa Materials under terms and conditions which evince good faith; 2) recognize and bargain with the Union as the exclusive collective-bargaining representative of the facility’s production and maintenance employees; 3) post copies of this Order at the Pacific Custom facility in all locations where employee notices are customarily posted and send copies of this Order to all employees entitled to offers of reinstatement under this Order; and, 4) within ten days of the issuance of this Order, submit to this Court and the Regional Director, a sworn affidavit describing the manner in which Respondent has complied with this temporary injunction.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Respondent has submitted twenty-eight pages of single-spaced objections, in violation of the Local Rules, to the affidavit testimony offered by Petitioner. This Court does not rely on any testimony to which Respondent objects in reaching its conclusions, unless otherwise noted and explained in this decision. As a threshold matter, however, the Court rejects Respondent's argument that "most” of Petitioner’s affidavit testimony violates Local Rule 7-5.
 

 Because Mr. Allen accepted employment and began some hiring duties on behalf of TXI in late November, this Court rejects Respondent's hearsay objections to statements made by Mr. Allen’s statements after December 1, 1995.
 

 [2]
 

 . This statement is admissible pursuant to Federal Rule of Evidence 801(d).
 

 [3]
 

 . It should be noted, however, that these other two facilities are located in more rural areas of southeast California.
 

 [4]
 

 . This statute reads, in pertinent part: "Employees shaE have the right to self-organization, to form, join, or assist labor organizations, to bargain coEectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of coEective bargaining or other mutual aid or protection____"
 

 [5]
 

 . Respondent argues that the former owner’s business plan for 1996 shows a desire to increase the soil remediation business to 61% of 1996 revenues, and thus a substantial continuity does not exist. However, the NLRB inquiry focuses on business realities rather than corporate plans, so this potential increase in the soil remediation revenues is irrelevant.
 

 [6]
 

 . Whether an employer is a successor also turns on the substantial continuity of other business characteristics, as discussed above.
 
 See
 
 section B.l,
 
 supra.
 

 [7]
 

 . In making this legal conclusion, the Ninth Circuit relied upon
 
 Packing House and Indus. Services v. N.L.R.B.,
 
 590 F.2d 688, 697-98 (8th Cir.1978). The
 
 Packing House
 
 court approved of a Board-issued remedial order requiring an employer to offer employment to all former employees. The employer contended that the order exceeded the Board's remedied authority since the employer had legitimate business reasons for not hiring the entire workforce. The circuit court did not find this argument persuasive because “the Board found ... that [the new employer] refused to hire any former [] employees in order to keep the union out.”
 
 Id.
 
 Although Respondent has not refused to hire any former employees of Port Costa, Petitioner has established a prima facie case that it refused to hire a majority of former employees in order to keep the union out. The
 
 Packing House
 
 reasoning can thus be applied to this action.
 

 [8]
 

 . In making this determination, the Court also relies upon the fact that many of the former Port Costa employees who were not rehired had at least five years of experience in the production of lightweight aggregate. Furthermore, some employees had worked at the Port Costa facility for over two decades. Aff. at 134, 195, 197.
 

 [9]
 

 . Respondent asserts that this Court must make findings of fact as to each employee at this stage of the analysis. However, primarily relying on
 
 Kallmann
 
 and
 
 Packing House,
 
 this Court concludes that such an analysis is not warranted. The Court also notes that approaching the analysis in this manner is more consistent with the
 
 Miller
 
 decision, in that Petitioner need only pro
 
 *1454
 
 vide "some evidence and an arguable legal theory” to prevail in a 10(j) motion; a standard which even Respondent concedes "stacks the deck against Pacific Custom.”
 

 [10]
 

 . Three weeks after his interview, Mr. Cousart went to the Pacific Custom facility and asked if he had been hired. When he was told he hadn’t been, he told Lee Allen that a mistake had been made. Mr. Allen then told Mr. Cousart to come in for a physical, and eventually hired Mr. Cousart. Lieber Dec., Exh. F at 1344 — 45.
 

 [11]
 

 . Similar rebuttal evidence was offered as to Lucio Gutierrez, Allen Dec. at ¶ 48, and Horatio Villalobos. Allen Dec. at ¶ 78.
 

 [12]
 

 . The refusal to require a reinstatement of the terms and conditions of employment that existed under Port Costa does not prevent this Court from ordering the reinstatement of employees, such as Ricardo Ortiz, who were actually offered employment from Pacific Custom Materials but refused the offers. Lieber Dec., Exh. B at 1052. The offers made to these former Port Costa employees were made under conditions in which the employer would not recognize the Union or its bargaining obligation. The union status of a facility is a powerful consideration which potential employees take into account when deciding whether to accept or reject a job offer. Mr. Ortiz and others similarly situated must be provided an opportunity to accept or reject a reinstatement offer consistent with the terms of the injunctive relief.
 

 [13]
 

 . Specifically, Respondent will incur about $10,000 in administrative costs associated with compliance and retraining. Yonz Dec. at ¶ 27.