NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0012n.06

No. 12-6628

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Jan 13, 2014*
DEBORAH S. HUNT, Clerk

GARY W. MUFFLEY, Regional Director of the Ninth Region
of the National Labor Relations Board, for and on Behalf of the
National Labor Relations Board,

      Petitioner-Appellant,

         v.

VOITH INDUSTRIAL SERVICES, INC.; UNITED
AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA, LOCAL UNION
NO. 862, AFL-CIO; UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, AFL-CIO,

      Respondents-Appellees.

On Appeal from the United
States District Court for the
Western District of Kentucky

Before: **BATCHELDER, Chief Judge; GUY and MOORE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Gary W. Muffley, Regional Director of the

Ninth Region of the National Labor Relations Board (Board), petitioned for an order of interim

injunctive relief pursuant to § 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j),

pending the Board's resolution of its underlying administrative complaint. The administrative

complaint alleged that various unfair labor practices were committed by Voith Industrial Services,

Inc. (Voith), and both the United Automobile, Aerospace and Agricultural Implement Workers of

America, Local 862, AFL-CIO, and its International Union (UAW), in connection with a contract

for "yard work" to be performed at Ford Motor Company's Louisville Assembly Plant. The Board

argues that the district court abused its discretion in denying injunctive relief by misapprehending

the relevant status quo and otherwise failing to properly evaluate whether injunctive relief would be "just and proper." Voith responds in defense of the district court's judgment, but the UAW has not filed a brief on appeal. For the reasons that follow, we affirm.

**I.**

The underlying administrative proceedings arose out of a series of unfair labor practice charges brought between February and June 2012 by the General Drivers, Warehousemen & Helpers, Local 89, affiliated with the International Brotherhood of Teamsters (Teamsters), which had historically represented yard workers at Ford's Louisville Assembly Plant (LAP). Voith was the successful bidder for a new contract to perform yard work at the LAP, which was awarded after a shutdown for retooling that lasted more than a year.

The Board's consolidated complaint—issued in June and amended in July 2012—alleged primarily: (1) that Voith discriminatorily refused to hire its predecessor's Teamsters-represented employees and unlawfully refused to recognize or bargain with the Teamsters regarding yard work at the LAP; (2) that Voith and the UAW unlawfully coerced employees to authorize the UAW as their exclusive bargaining representative; and (3) that Voith unlawfully provided, and the UAW unlawfully accepted, assistance and recognition as the exclusive bargaining representative for Voith's yard employees. The ALJ conducted an administrative hearing with respect to the Board's administrative complaint over a total of thirteen days during August, September, and October 2012.

In August 2012, the Director commenced this ancillary § 10(j) proceeding by filing a petition and an amended petition in federal district court seeking temporary injunctive relief against Voith and the UAW pending resolution of the administrative proceedings. Arguing for an expedited decision based on a portion of the administrative record, the Director submitted memoranda in

support of the petition and a proposed show cause order.  The district court found no need for further briefing or a show cause hearing, and denied the petition for the reasons stated in its opinion and order entered October 30, 2012.  *See Muffley v. Voith Indus. Servs., Inc.*, 906 F. Supp. 2d 667 (W.D. Ky. 2012).

The Board filed this timely appeal, but not until December 26, 2012—just after the ALJ issued his decision finding that most of the alleged unfair labor practices had been proven and recommending broad remedial and injunctive relief.  *See Voith Indus. Servs., Inc.*, No. 9-CA-75496, 2012 WL 6755112 (NLRB Div. of Judges Dec. 21, 2012).  To date, however, the underlying administrative proceedings remain pending as cross-exceptions to the ALJ's decision have been filed and a final Board decision has yet to be issued.

## II.

Section 10(j) authorizes the Board, upon issuance of an administrative complaint alleging any unfair labor practice, to petition the appropriate district court to grant "such temporary relief or restraining order as it deems just and proper."  29 U.S.C. §  160(j); *see also Gottfried v. Frankel*, 818 F.2d 485, 492-93 (6th Cir. 1987).  To grant such relief, the district court is required to find both (1) "reasonable cause" to believe an unfair labor practice has occurred; and (2) that injunctive relief with respect to such practices would be "just and proper."  *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234 (6th Cir. 2003) (adhering to this two-part test); *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001) (citing *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir. 1988)).  Since unfair labor practice charges are to be adjudicated by the Board, subject to judicial review, courts must be mindful not to adjudicate the merits of such charges in deciding whether to grant relief in the ancillary § 10(j) proceedings.  *Gottfried*, 818 F.2d at 492; *Schaub*, 250

F.3d at 969.[1]

## A.    Factual Background

The essence of this matter is a conflict over which union—the Teamsters or the UAW—would represent the hourly yard workers employed by Voith at the LAP. Production employees at the LAP, as well as Voith's janitorial employees, are and have been represented by the UAW. Yard workers, on the other hand, had been represented by the Teamsters since the early 1950s, as successive employers—until Voith—agreed to hire their predecessor's Teamsters-represented yard employees. Yard work, or vehicle processing and inventory management, includes tasks such as receiving vehicles as they leave the production line, scanning them into inventory, and moving them to a staging area for eventual transportation by rail or car hauler.

From February 2009 until December 2010, yard work at the LAP was performed by the Teamsters-represented employees of Auto Handling, Inc. (AHI), which is a subsidiary of Cooper Transport Company, Inc. (Cooper). Cooper had other contracts with Ford, including contracts for car hauling and related services at the LAP, and was a signatory to the Teamsters' National Master Automobile Transport Agreement. In December 2010, Ford shut down all production at the LAP in order to retool the facility before switching production from the Explorer to the new model Escape. Production did not resume again until April 2012.

AHI's contract ended with the shutdown in December 2010. As a result, AHI ceased

---

[1]This court adheres to the reasonable cause/just and proper standard, *Ahearn*, 351 F.3d at 235, although there is a split of authority with some circuits adopting or incorporating a traditional four-factor balancing test for preliminary injunctions. *Glasser v. ADT Sec. Servs., Inc.*, 379 F. App'x 483, 485 n.2 (6th Cir. 2010) (unpublished) (discussing cases); *see, e.g.*, *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 97 (3d Cir. 2011) (adhering to two-part test); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001) (adhering to four-part test).

operations at the LAP; terminated its 17 full-time employees; placed 195 on-call employees on indefinite layoff; and left 166 hourly yard workers on its seniority list. AHI provided notices required by the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-2102, advising that 195 union and non-union employees were being laid off indefinitely. AHI's yard workers have been on indefinite layoff since December 2010 (with rights to bid into other bargaining unit work).

Voith is in the business of providing janitorial, yard management, and other logistics services to customers in the automobile industry, and is a signatory to a national collective bargaining agreement with the UAW. Since 2008, Voith has had a contract to provide cleaning and janitorial services at the LAP. A small cleaning crew was maintained during the shutdown, but Voith's annual bid in the fall of 2011 projected that it would need to hire many more janitorial employees to meet the requirements of the contract once production resumed.

In October 2011, Ford solicited bids for the yard work from selected contractors and indicated that the contract would be implemented in March 2012. Ford's Request for Quote (RFQ) asked each bidder—including both Cooper and Voith—to specify its projected workforce and the basis for its proposed labor costs. Cooper's bid identified its labor agreements with the Teamsters. Voith's bid relied on its labor agreements with the UAW, which it represented would cover all work it performed at Ford-related sites. A separate submission by the UAW asserted that all Ford yard work should be performed by UAW-represented employees.[2]

Ford delayed awarding the contract past the projected date in December 2011. At that time, the UAW had begun assisting Voith in recruiting applicants for new janitorial positions at the LAP

---

[2]There seems to be no dispute that the UAW agreements allowed for substantially lower wage rates than had been paid to AHI's Teamsters-represented yard employees (*i.e.*, $14 vs $21 per hour).

(some of whom claimed to have been told to apply for a janitorial position in order to be eligible for yard work). On February 1, 2012, Ford solicited additional bids for temporary yard work to be performed during the vehicle launch under a separate "batch and hold" contract. On February 6, Voith conditionally hired a number of janitorial employees. The Teamsters claimed to have been told on February 10 both that Voith would get the contract and that Voith's yard employees would be represented by the UAW.

In fact, Voith was awarded the "batch and hold" contract on February 13, 2012, and the long-term contract for yard work on March 1, 2012. On February 14, the Teamsters made a written demand for recognition and urged Voith to hire its yard workers from AHI's seniority list. The Teamsters also solicited and forwarded applications from former AHI yard employees (32 applications were forwarded between February 14 and 17 and another 52 were forwarded before March 7). Voith did not contact these former AHI employees, however, and later insisted that there was not enough time to complete the hiring process to be ready to perform by the March 12 implementation date.

On February 20, 2012, Voith awarded 11 yard positions to senior janitorial employees who bid into the jobs and required 39 newly hired janitorial employees to transfer into the remaining yard positions. UAW organizers met with these 50 newly reassigned employees, all of whom signed new UAW authorization cards. On February 22, 2012, after certification of the UAW's majority status, Voith recognized the UAW as the exclusive bargaining representative for its hourly yard employees. But by March 1, when Ford awarded the originally bid contract to Voith, the number of yard employees working at the LAP had fallen to approximately 22 (some returned to janitorial work and others were unable or unwilling to do yard work). Between that attrition and the requirements of

the originally bid contract, Voith needed to hire 50 additional full-time yard employees.

Voith turned to Aerotek, Inc., a staffing agency it had worked with before, to screen the applicants to be interviewed and considered by Voith. The ALJ found that Aerotek, acting as Voith's agent, informed some applicants that the vehicle processing positions would be UAW jobs, discriminated against Teamsters members, and excluded former AHI employees who had not worked recently or did not pass newly implemented behavioral testing. Voith contests the findings, arguing that Aerotek actually contacted a disproportionate number of former AHI employees, many of whom either did not return calls or did not complete the application process; that 46 of the 85 applicants forwarded by Aerotek were former AHI employees (54%); and that a total of 17 Teamsters members were hired for yard work (12 of whom were former AHI employees). Voith argues that the Teamsters' less-than-majority status resulted from a lack of interest from former AHI employees and not any alleged unfair labor practices.

On April 9, 2012, Voith withdrew recognition of the UAW after concern was raised that it may have been prematurely granted. When production resumed on April 16, Voith had 75 permanent full-time yard employees, 11 of whom were former AHI employees. UAW organizers met with Voith's yard workers twice, although Voith denies that the meetings were held on work time or that coercive pro-UAW statements were made. There is no dispute, however, that the UAW secured newly signed UAW authorizations from a majority of the workforce. On May 1, 2012, Voith recognized the UAW as the exclusive bargaining representative for its yard employees.[3]

**B.      Reasonable Cause**

---

[3]During orientation on April 11, allegedly on work time, UAW organizers told Voith's yard workers to sign UAW authorization cards or they would not be allowed to continue working. Also, on April 16, Voith drove a van of yard workers from an offsite location to the break room and allegedly directed them inside where they were met by UAW officials and informed that they would sign UAW authorization cards.

The Director bears a relatively insubstantial burden to establish reasonable cause, which "requires only that the Board's legal theory underlying the allegations of unfair labor practices be 'substantial and not frivolous' and that the facts of the case be consistent with the Board's legal theory." *Ahearn*, 351 F.3d at 237 (quoting *Schaub*, 250 F.3d at 969). The legal theory is reviewed de novo and the facts supporting it are reviewed for clear error. *Id*. Because the district court is not to resolve conflicting evidence or weigh credibility in a § 10(j) proceeding, its findings cannot be clearly erroneous as long as facts exist that could support the Board's theory. *Id*.

Here, the district court declined to make any factual findings concerning the alleged unfair labor practices in advance of the ALJ's decision. *Muffley*, 906 F. Supp. 2d at 669 n.1. Rather, the district court assumed from the facts alleged by the Director that there was reasonable cause to believe unfair labor practices had occurred as part of "a concerted effort to thwart the Teamsters presence as early as the Fall of 2011." *Id*. at 672. Voith disputes that the Director's legal theories are substantial and supported by the facts, and argues that the ALJ's findings are clearly erroneous.

Emphasizing the temporary nature of § 10(j) relief, the Director urges this court to determine in the first instance that reasonable cause exists based on the administrative record and taking notice of the ALJ's subsequently issued decision. Although the ALJ's decision is under review by the Board, we may take the ALJ's findings and conclusions into account in assessing whether the reasonable cause standard has been met. *See Ahearn*, 351 F.3d at 238 (ALJ's decision "lends further support" to the district court's reasonable cause determination); *Glasser v. ADT Sec. Servs., Inc.*, 379 F. App'x 483, 487-88 (6th Cir. 2010) (unpublished).

**1.      Successorship, Failure to Hire, and Refusal to Bargain**

The Director claims that Voith was a successor employer under the *Burns/Fall River* doctrine

obligated to recognize and bargain with the union that represented its predecessor's employees. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987). A new employer is not bound by the substantive terms of a prior collective bargaining agreement, but "where a new employer acquires a business without changing its essential nature, and a majority of its employees previously worked for the predecessor, the new employer has a duty to recognize and bargain with the incumbent union representing its predecessor's employees." *Straight Creek Mining, Inc. v. NLRB*, 164 F.3d 292, 295 (6th Cir. 1998) (citing *Fall River*, 482 U.S. at 36-41). Whether an entity constitutes a successor employer is a factual determination based on the totality of the circumstances and the focus of that inquiry is "whether there is 'substantial continuity' between the enterprises," meaning "the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Fall River*, 482 U.S. at 43 (citations omitted).

The threshold inquiry for "substantial continuity" is "whether the majority of the new employer's workforce was previously employed by the predecessor." *Straight Creek*, 164 F.3d at 295. Here, it was not. However, although a new employer is not required to hire its predecessor's employees, an employer violates § 8(a)(3) of the Act by refusing to hire or retain the employees of its predecessor solely because they are union members or to avoid having to recognize a union. *See* 29 U.S.C. § 158(a)(3); *Howard Johnson Co. v. Hotel & Rest. Employees*, 417 U.S. 249, 262 n.8 (1974). An employer's motivation is evaluated under the Board's *Wright Line* test, which places the initial burden on the General Counsel to establish anti-union animus and then shifts the burden to the employer to show that it would not have hired the predecessor's employees even in the absence of discriminatory motive. *Planned Bldg. Servs., Inc.*, 347 NLRB 670 (2006) (citing *Wright*

*Line*, 251 NLRB 1083 (1980), *enforced* 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982)); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983).[4]

The ALJ found that discriminatory motive could be inferred from the circumstances, rejected Voith's defenses, and concluded that Voith had established a hiring procedure designed to exclude or limit the hiring of former AHI employees who were Teamsters members in violation of § 8(a)(1) and (3) of the Act. *See* 29 U.S.C. § 158(a)(1) and (3). Voith attacks the ALJ's finding, denying that it acted with anti-union animus in transferring its janitorial employees to yard work in the initial wave of hiring, in retaining Aerotek to perform screening instead of hiring former AHI employees en masse, or in actually hiring less than a majority of former AHI employees in the second wave of hiring. Voith reasserts its defenses, including that it believed the after-acquired clauses in its UAW contracts would cover this work; that time constraints imposed by Ford's requirements made reassignment of current janitorial employees necessary; and that 46 of the 85 applicants forwarded by Aerotek to fill 50 open positions were former AHI employees. Voith maintains that more former AHI employees would have been hired into the full-time positions if they had returned calls and successfully completed the application process. Whether Voith will succeed in convincing the Board that the evidence does not support the ALJ's findings remains to be seen, but the record is sufficient to establish that the Director's legal theory is "substantial and not frivolous" and facts exist that could support that theory.

Thus, the Director has met his relatively insubstantial burden of establishing reasonable cause to believe Voith violated § 8(a)(3) of the Act by refusing to hire AHI's former employees

---

[4]Although apparently not at issue here, the test in refusal-to-hire and refusal-to-consider cases also requires that the General Counsel establish that the applicant was genuinely interested in becoming an employee. *See NLRB v. Beacon Elec. Co.*, 504 F. App'x 355, 362-63 (6th Cir. 2012) (discussing *Toering Elec. Co.*, 351 NLRB 225 (2007)).

because they were Teamsters members in order to avoid the obligation to recognize the Teamsters. When such discrimination is shown, the Board assumes that a majority of the predecessor's employees would have been hired and the Teamsters would have retained majority status absent the unfair labor practice. *Planned Building*, 347 NLRB at 673.

Once continuity of workforce is established, the other factors to be considered in determining whether there was substantial continuity for successorship purposes include: "(1) whether the business of the two entities remain unchanged; (2) whether the employees continue to perform the same job functions under unchanged working conditions; (3) whether the production processes remain the same; and (4) whether the new entity provides the same customers with the same product." *Straight Creek*, 164 F.3d at 296 (citing *Fall River*, 482 U.S. at 43). Also, although a hiatus in operations can destroy continuity, it "is only one consideration in a continuity inquiry, and 'is relevant only when there are other indicia of discontinuity.'" *Id.* (quoting *Fall River*, 482 U.S. at 45) (a 54-month hiatus during a strike that followed a mine closure did not outweigh other factors).

To be sure, Voith did not take over AHI's operations and the yard work did not continue uninterrupted. Also, it is relevant that the 14-month hiatus in operations coincided with the end of AHI's contract, although the shutdown was for retooling and the plant was expected to reopen. In addition, Voith disputes that the yard work it is performing is substantially the same as the yard work AHI had previously performed. Voith repeats the argument that the businesses were not the same because AHI/Cooper had performed both yard work and car hauling at the LAP, but Ford divided the car hauling work among a number of other contractors and awarded only the yard work to Voith. Voith also relied on testimony from Ford representatives indicating that Ford had

implemented substantial and pervasive changes to its post-production logistics, including changes to the processes used, integration of logistics with another plant, and use of a new off-site location for vehicle staging.

Despite Voith's arguments to the contrary, the ALJ found that the evidence established substantial continuity between the yard work performed by Voith and AHI and concluded that Voith was a successor employer to AHI. Whether or not Voith may ultimately prevail before the Board, facts exist to support the Director's substantial and nonfrivolous claim that Voith was a successor employer whose undisputed refusal to recognize and bargain with the Teamsters and imposition of initial terms and conditions of employment violated § 8(a)(1) and (5) of the Act. *See* 29 U.S.C. § 158(a)(1) and (5).

**2.      Unlawful Assistance and Recognition**

Voith also denies that it provided unlawful assistance to the UAW on February 20, April 11, and April 16, 2012, by allowing UAW representatives to meet with employees during work time to urge them to sign membership applications and authorizations in violation of § 8(a)(1) and (2). *See* 29 U.S.C. § 158(a)(1) and (2). Although Voith disputes that it played any role in the UAW organizing campaign, the ALJ credited testimony indicating that Voith supervisors directed and/or transported employees to mandatory meetings with UAW representatives during work time, knew that UAW organizers would solicit membership and check off authorization cards during those meetings, and granted recognition to the UAW based on a certification of its majority status based on those authorization cards. Such factual disputes are not for us to resolve in a § 10(j) proceeding.

Nor can Voith overcome the claim that it unlawfully granted recognition to the UAW initially on February 22, 2012, and for a second time on May 1, 2012, in violation of § 8(a)(1) of the

Act. *See* 29 U.S.C. § 158(a)(1). Accepting, as we must, that there is evidence of coercive pro-UAW statements, unlawful assistance to the UAW, and discriminatory refusal to hire its predecessor's employees or bargain with the Teamsters, the Director has met his burden to establish reasonable cause to believe that UAW recognition was not based on an uncoerced majority of the workforce. Although Voith may ultimately succeed before the Board, there are facts consistent with the Director's substantial and nonfrivolous legal theory that Voith provided and the UAW accepted unlawful assistance and recognition as the exclusive bargaining representative for Voith's yard workers.

Even when reasonable cause has been established, however, the proposed injunctive relief also must be "just and proper." *Ahearn*, 351 F.3d at 239.

## C.    Just and Proper

Congress' adoption of § 10(j) reflects its "view that interim injunctive relief to restore and preserve the status quo, pending final Board adjudication, may be required to avoid frustration of the basic remedial purposes of the [NLRA] and possible harm to the public interest." *Fleischut*, 859 F.2d at 28-29; *see also Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1225 (6th Cir. 1993). As such, the temporary relief granted under § 10(j) should be only that which is "'reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.'" *Gottfried*, 818 F.2d at 494 (citation omitted). The district court's determination that interim relief would not be just and proper is reviewed for abuse of discretion. *Fleischut*, 859 F.2d at 30.

Here, the § 10(j) relief being sought pending the Board's final decision includes: hiring (or offering to hire) 85 Teamsters applicants who the ALJ found had been denied employment,

displacing current UAW-represented employees to the extent necessary (instatement); withdrawing UAW recognition and requiring Voith to recognize and bargain with the Teamsters (bargaining); and rescinding all unilateral terms and conditions of employment, including wages, hours, benefits, and the contract with Aerotek to perform temporary work that would otherwise have been performed by former AHI employees (rescission). The district court found that, "[r]ather than seek[ing] a return to the status quo, the Director seeks affirmative injunctive relief to right the perceived wrongs," and concluded that it was "forbidden from usurping the power of the NLRB by taking such action." *Muffley*, 906 F. Supp. 2d at 672. Further, the district court concluded that it would not grant interim relief requiring the unseating of both current employees and the UAW in advance of any adjudication of the administrative complaint. *Id*. at 672-73.

The Director urges this court to determine that injunctive relief would be "just and proper," and then remand to the district court with instructions to issue the proposed injunction. *See Frye*, 10 F.3d at 1225 (explaining that appellate courts have not been reluctant to remand with instructions to issue an appropriate injunction under § 10(j)). Voith argues, on the other hand, that any remand should be for further findings after an evidentiary hearing. *See Fleischut*, 859 F.2d at 31 (remanding for elaboration where the findings were inadequate); *Glasser*, 379 F. App'x at 489 (remanding for district court to decide whether injunction would be just and proper). The Director argues that the district court abused its discretion in denying interim relief by misapprehending the relevant status quo, misunderstanding its role in § 10(j) proceedings, and failing to properly assess the need for interim injunctive relief in this case.

This court has described the status quo to be preserved or restored as that which existed before the alleged unfair labor practices took place. *Fleischut*, 859 F.2d at 30 n.3; *Frye*, 10 F.3d at

1226 ("the state of affairs before the alleged unlawful conduct began was that of union representation"). Here, the district court found that the alleged unfair labor practices began, at the earliest, in the fall of 2011 with Voith's alleged scheme to oust the Teamsters and recognize the UAW as the basis for its bid for the new contract to perform yard work at the LAP. Before that, as the district court found, the status quo was the indefinite layoff of AHI's Teamsters-represented employees. Moreover, the district court explained that status quo was not simply a "temporary cessation of production," but involved the complete shutdown of operations and the end of AHI's contract as of December 2010. *Muffley*, 906 F. Supp. 2d at 672. Viewing the status quo fairly literally, the district court concluded that the interim relief requested in this case would not represent a return to the state of affairs that existed prior to the alleged unfair labor practices. *Id.*

Arguing that the status quo is not to be viewed so restrictively, the Director contends that it was error to ignore the claim that, although on indefinite layoff, the former AHI employees also had a reasonable expectation that they would be hired (or not discriminated against) by whichever contractor became the successful bidder for future yard work at the LAP. That is, the Director contends, the restoration or preservation of the status quo may include what would have happened absent the alleged unfair labor practices. *See, e.g.*, *Kobell v. United Paperworks Int'l Union, AFL-CIO*, 965 F.2d 1401, 1410 (6th Cir. 1992) (reversing denial of interim relief ordering union to sign agreement that would have been entered but for illegal pooled voting procedure); *Ahearn*, 351 F.3d at 240 (rejecting argument that reinstatement to different position would not restore the status quo). Accepting that the Director may be seeking restoration of the status quo, the critical question is whether the interim injunctive relief being sought is reasonably necessary to preserve the Board's ultimate remedial power once the administrative proceedings have concluded.

The Director's second claim of error is that the district court's reasoning seems to imply that interim relief should not be granted in advance of any adjudication of the administrative complaint. Indeed, the district court attempted to distinguish two cases in which interim relief was approved against an alleged successor employer for refusing to hire its predecessor's union-represented employees on the grounds that those cases "involved interim injunctive relief considered *after* securing a favorable Board ruling." *Muffley*. 906 F. Supp. 2d at 673 (distinguishing *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001), and *Scott v. El Farra Enters., Inc.*, 863 F.2d 670 (9th Cir. 1988)). In fact, neither case can be distinguished on that basis because no administrative adjudication had been issued at the time of the district court's initial denial of § 10(j) relief. Moreover, it is precisely, and only, during the pendency of the administrative proceedings that the district court is authorized to grant interim injunctive relief under § 10(j). *See Kobell*, 965 F.2d at 1406. Notwithstanding the implication, however, it is evident from the district court's decision that it recognized its authority to order interim relief but declined to exercise that discretion in advance of the ALJ's decision because it would require the unseating of both current employees and the UAW.

Without explicitly discussing whether interim relief was reasonably necessary to preserve the Board's remedial powers, the district court explained that this case was wholly unlike two refusal-to-bargain cases in which interim relief had been granted. Specifically, in both *Frye* and *Small*, an alleged successor employer took over the predecessor's operations with little or no interruption, hired a majority of the predecessor's union-represented employees, and then refused to recognize or bargain with the union chosen by those employees. *Muffley*, 906 F. Supp. 2d at 672-73 (distinguishing *Frye*, 10 F.3d at 1223 (receiver refused to recognize the union, purchaser of assets

hired the predecessor's employees but refused to bargain with the union) and *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1185-86 (9th Cir. 2011) (purchaser of hospital in bankruptcy retained a majority of the predecessor's union-represented nurses and refused to bargain with the union)).  It is not difficult to see that interim relief would be just and proper in the case of an employer that has refused to bargain with its employees' union to escape having to bargain with a union.

Of course, as the Director insists, interim instatement—including the unseating of current employees—may be a permissible exercise of discretion under § 10(j) when it is reasonably necessary to preserve the Board's ability to remedy the unfair labor practices once the administrative proceedings are concluded.  In both *Scott* and *Bloedorn*, for example, a successor employer took over its predecessor's grocery business, but refused to hire its predecessor's union-represented employees and succeeded in replacing the union workforce with a non-union workforce.  The refusal to hire more than a minority of the predecessor's union-represented employees "inflicts a particularly potent wound on the union and its members."  *Bloedorn*, 276 F.3d at 298 (applying traditional four-factor test).  Voith argues that the need for interim instatement is not as strong in this case, especially because the alleged unfair labor practices resulted in the recognition of the UAW instead of the Teamsters for yard workers at the LAP.

The Director urges this court to find that it was an abuse of discretion to deny interim instatement, bargaining, and rescission because it is likely that the harm cannot be adequately remedied once the Board issues its final decision.  *See Bloedorn*, 276 F.3d at 299 (employer "dramatically shifted the status quo in its favor through illegal means").  Articulated in several ways, the Director argues that an offer of interim instatement of the 85 Teamsters members is necessary because:  many of the laid-off employees are likely to have found employment elsewhere or left the

area dissipating support for the Teamsters (*i.e.*, scattering); delay in vindicating employee rights will discourage support for the Teamsters (*i.e.*, chilling); and interim instatement will restore support for the Teamsters by showing that the union can and will protect them (*i.e.*, vindication and protection).[5]

Without disputing that these are relevant considerations, Voith vehemently denies that there are legitimate concerns that support for the Teamsters will be irrevocably eroded before the Board completes the administrative proceedings. In particular, Voith contends that whatever scattering of Teamsters employees has occurred was the result of the indefinite layoff in December 2010, which was more than a year before the new contract was awarded to Voith and a year and a half before the administrative complaint was issued by the Board. Moreover, Voith relies on evidence that many of the Teamsters who claim to have been denied employment with Voith actually bid into other Teamsters work with Cooper/AHI and that some have since worked more hours than they did as yard employees at the LAP. In fact, Voith asserts that there is no reason to think that these Teamsters have moved away since the success of the new vehicle launch has resulted in more work for Teamsters members in the area.

Finally, as Voith persuasively argues, there is no reason to believe in this case that the denial of interim injunctive relief will allow support for the Teamsters to erode to the point that the Board will be unable to adequately remedy the harm resulting from the alleged unfair labor practices. As a practical matter, both the UAW and the Teamsters represent employees working for Ford or its

---

[5]The cases cited by the Director for these general propositions predominately involve interim reinstatement of employees discharged for union organizing or union support by an employer resisting the union. *See, e.g.*, *Pye v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001) (affirming reinstatement of five employees discharged for union organizing activities); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) (reversing the denial of § 10(j) relief where employer threatened plant closure, interfered with union activity and fired union organizers); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749-50 (9th Cir. 1988); *Angle v. Sacks*, 382 F.2d 655, 660-61 (10th Cir. 1967) (affirming reinstatement of six employees discharged for union activity following certification of election).

contractors at the LAP. Nor is there reason to doubt that, if the Board accepts the ALJ's recommendations, the remedies will be effective; if it stands, the ALJ would essentially order a do-over for the Teamsters. Voith will be required to hire or offer to hire 85 Teamsters members; to open temporary jobs being performed by Aerotek to those Teamsters; to rescind all unilaterally imposed terms and conditions of employment (*i.e.*, wages and benefits); to "make whole" both the Teamsters denied employment and Voith's UAW-represented employees for lost wages and benefits; and to recognize and bargain with the Teamsters for a new contract. Although the district court did not specifically discuss these issues, we cannot conclude that interim injunctive relief is reasonably necessary to protect the Board's power to remedy the harm from the unfair labor practices once a final administrative decision is issued.

With the benefit of the arguments presented on appeal, and examining whether interim relief would be just and proper in the first instance, we find that remand is not necessary because the district court did not abuse its discretion in denying the § 10(j) petition in this case.

**AFFIRMED.**

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Despite agreeing with much of the majority's analysis in this case, I must dissent because the majority has assumed a role assigned to a district court. The majority concludes that Gary W. Muffley, the Regional Director of the Ninth Region of the National Labor Relations Board (the "Director" and the "Board," respectively), has established that there exists reasonable cause to believe that the defendants engaged in unfair labor practices. I agree. These unfair labor practices, according to the majority, included failure to hire legacy Teamsters employees and to recognize the Teamsters as the incumbent representative where Voith Industrial Services, Inc. ("Voith") was a successor employer. I agree. The majority further concluded that there is reasonable cause to believe that Voith's unfair labor practices also included unlawful assistance to and recognition of the United Auto Workers (UAW). I agree. In reviewing the district court decision, the majority properly points out that "it is precisely, and only, during the pendency of the administrative proceedings that the district court is authorized to grant interim injunctive relief under § 10(j)," Maj. Op. at 18, correcting the district court's mistaken view that a district court "is forbidden from usurping the power of the [Board] by [issuing a § 10(j) injunction]," *Muffley v. Voith Indus. Servs., Inc.*, 906 F. Supp. 2d 667, 672 (W.D. Ky. 2012). I agree. However, rather than holding, as an appellate panel at this point must, that the district court abused its discretion by basing its decision on an incorrect understanding of the law, and remanding with proper instructions, the majority simply has discarded its role as a reviewing court and has assumed the role of the district court to determine for itself whether interim injunctive relief is just and proper. Because the majority improperly enlarges the role of the appellate courts, I must respectfully dissent.

Under § 10(j), the Board has the "power . . . to petition any United States district court,

within any district wherein the unfair labor practice in question is alleged to have occurred . . . , for appropriate temporary relief or restraining order. . . . [T]he court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). Before issuing the temporary injunction, the district court must find "'reasonable cause' to believe that the unfair labor practices alleged have occurred" and that "injunctive relief is 'just and proper.'" *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir. 1988). This extraordinary remedy is intended to be limited to "those situations in which the effective enforcement of the [National Labor Relations Act ("NLRA")] is threatened by the delays inherent in the [Board's] dispute resolution process." *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989).

"Petitioner's burden of showing 'reasonable cause' is 'relatively insubstantial,' inasmuch as the proof requires only that the Board's legal theory underlying the allegations of unfair labor practices be 'substantial and not frivolous' and that the facts of the case be consistent with the Board's legal theory." *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003). Rather than proving a violation of the Act or showing the validity of his theory of liability, the Director must produce only some evidence supporting a substantial, non-frivolous theory of liability. *See Fleischut*, 859 F.2d at 29. Consequently, the district court's duty is to determine whether facts exist that support the Director's non-frivolous theory of liability, not to resolve conflicting facts. *Id.*

Injunctive relief under § 10(j) is authorized under a showing that such relief is "just and proper" rather than the more stringent standard of irreparable harm. 29 U.S.C. 160(j); *see Fleischut*, 859 F.2d at 30 n.3. In determining whether an injunction is "just and proper," a district court must recognize that "section 10(j) was added to give the Board a means of preserving the status quo

pending the completion of its regular procedures." *Levine v. C & W Mining Co.*, 610 F.2d 432, 436 (6th Cir. 1979). "By the same token, the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 (3d Cir. 1984). Consequently, where "the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless," a preliminary injunction to preserve the status quo is proper. *Sheeran v. Am. Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (internal quotation marks omitted). This circuit has adopted the Second Circuit's definition of the status quo as "the status quo which is to be preserved or restored is that which existed immediately prior to the commission of unfair labor practices, not that which came into being as a result of the very acts being litigated." *Levine*, 610 F.2d at 437.

We review the district court's factual determination whether there is reasonable cause to believe that the defendants have committed unfair labor practices for clear error and review the district court's conclusion that injunctive relief is not just and proper under the abuse-of-discretion standard. *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969-70 (6th Cir. 2001). "It is an abuse of discretion for a district court to commit legal error or find clearly erroneous facts." *United States v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009); *see also Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("We review the grant of preliminary injunctive relief for an abuse of discretion, reversing where the district court has committed legal error or relied upon clearly erroneous factual findings.").

In this case, the district court made two legal errors, misunderstanding both the status quo that § 10(j) was enacted to preserve and the nature of § 10(j) relief itself. The district court equates

the status quo to the positions of the individual employees. *See Muffley*, 906 F. Supp. 2d at 672 (surmising that "the *status quo* of indefinite layoff remains at the current time"). The status quo meant to be preserved is not the individual employees and their positions, but rather the status quo of the labor relations. *See Ahearn*, 351 F.3d at 240 (affirming a § 10(j) injunction that restored a terminated employee not to her previous position and schedule, but to the job type in which she would have been working were it not for the unfair labor practice). One Sixth Circuit panel, after defining the status quo as the condition "existing *prior* to the adoption of the unfair labor practice," *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1410 (6th Cir. 1992), ordered a union to sign an agreement to which it would have agreed but for that unfair labor practice. *Id.* That panel concluded that ordering the parties to enter into a contract that was not in effect when the unfair labor practice took place is what "would return the parties to the status quo and protect the remedial powers of the Board." *Id.* Thus, this circuit has recognized that § 10(j) seeks to protect the status quo by allowing injunctive relief that restores what would have happened but for the unfair labor practice.

Rather than engaging with whether the district court has misunderstood the status quo, the majority "[a]ccept[s] that the Director may be seeking restoration of the status quo" in order to reach the "critical question . . . whether the interim injunctive relief being sought is reasonably necessary to preserve the Board's ultimate remedial power once the administrative proceedings have concluded." Maj. Op. at 17. The district court has simply not reached this question—failing to determine whether the Board's enforcement of the NLRA will be impaired if no § 10(j) injunction issues—because the district court misunderstood the nature of § 10(j) relief, its second legal error. Instead, the district court's opinion focused on the inappropriateness of providing the § 10(j) remedy

itself ahead of a full hearing before the Board:

> Rather than seek a return to the *status quo*, the Director seeks affirmative injunctive relief to right the perceived wrongs in (1) failing to consider and/or employ the [Cooper Transport] employees for yard work, and (2) failing to recognize the Teamsters, along with other alleged unfair labor practices which flow from these. The court is forbidden from usurping the power of the [Board] by taking such action.

*Muffley*, 906 F. Supp. 2d at 672. This lack of analysis and the strong language regarding what is "forbidden" to the court reveal that the district court concluded that it lacked the power to issue injunctive relief.

In fact, the district court is empowered by § 10(j) to grant this remedy in order to protect the Board's remedial powers *before* the Board has ruled. Under § 10(j), the Board has the "power . . . to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . . , for appropriate temporary relief or restraining order. . . . [T]he court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

The district court's error was not isolated. It concluded its opinion by refusing to "unseat workers and the UAW prior to any adjudication of the complaints by the [Board]." *Muffley*, 906 F. Supp. 2d at 973.[6] The purpose of § 10(j) is to allow district courts to issue temporary injunctive relief prior to adjudication by the Board. Thus, this statement reveals a deep misunderstanding of the purpose of § 10(j). Moreover, this misunderstanding is confirmed by the district court's opinion's next sentence:

---

[6]As stated earlier, while the replacement of the newly hired workers and the UAW as their recognized representative is likely to be the result of the injunction the Director seeks, such an injunction would merely restore the status quo of the labor situation before the unfair labor practices took place.

> Thus the cases of *Bloedorn ex rel. NLRB v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) and *Scott ex rel. NLRB v. El Farra Enter., Inc.*, 863 F.2d 670 (9th Cir. 1988) are distinguishable, as they both involved interim injunctive relief considered *after* securing a favorable Board ruling.

*Id.* In both cases cited, circuit courts of appeals reversed and remanded district court denials of injunctive relief, and in both cases, the Board had <u>not</u> completed its review process. *See Scott*, 863 F.2d at 675 (noting that the decision to issue a § 10(j) injunction is made "pending Board review"); *Bloedorn*, 276 F.3d at 284 (noting that the preliminary decision by a hearing officer did not come until nearly two months after the district court decision). The purpose of the injunctive relief is to preserve the status quo pending final adjudication by the Board. Once the Board has issued its decision, this order replaces and dissolves the § 10(j) injunction.

The majority recognizes this legal error by the district court. *See* Maj. Op. at 17–18 (noting that "the district court attempted to distinguish two cases," but that "neither case can be distinguished" on the district court's basis). The majority contradicts the district court's opinion that issuing injunctive relief before the Board has ruled would be usurping the Board's power by unconditionally stating that "it is precisely, and only, during the pendency of the administrative proceedings that the district court is authorized to grant interim injunctive relief under § 10(j)." *Id.* at 18. Up to this point, the majority and I are basically in agreement.

The majority, however, portrays this explicitly stated incorrect conclusion of the district court—that to order interim relief would be usurping the Board's power—as merely the district court's "implication." *Id.* Instead, the majority states that "it is evident from the district court's decision that it recognized its authority to order interim relief but declined to exercise that discretion in advance of the ALJ's decision because it would require the unseating of both current employees and the UAW." *Id.* This statement is truly astounding. Nowhere can I find any evidence in the

district court's opinion that it recognized its authority to order interim relief. It appears that stating that such a view is "evident" is all that the majority can do because it quickly concedes that the district could did not "explicitly discuss[] whether interim relief was reasonably necessary to preserve the Board's remedial powers." *Id.*

Other than declare that it had no power to provide interim relief, all that the district court did was attempt to distinguish two cases in which interim relief was granted. *See Muffley*, 906 F. Supp. 2d at 972–73 (calling *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221 (6th Cir. 1993), and *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011), inapposite and explaining why, in the district court's view, this case is unlike them). The majority notes this discussion and concludes that "[i]t is not difficult to see that interim relief would be just and proper in the case of an employer that has refused to bargain with its employees' union to escape having to bargain with a union," Maj. Op. at 19, a conclusion with which I wholeheartedly agree. However, showing that this case is distinguishable from two cases where interim injunctive relief was granted fails to answer the question whether interim injunctive relief is just and proper in this case. Answering the majority's "critical question . . . whether the interim injunctive relief being sought is reasonably necessary to preserve the Board's ultimate remedial power once the administrative proceedings have concluded," *id.* at 17, will provide the answer to whether such relief is just and proper. Yet, the district court simply does not grapple with this question.

Finding no analysis regarding its "critical question," the majority performs the analysis itself. *See id.* at 19–21 (laying out arguments by both sides and then, after acknowledging that "the district court did not specifically discuss these issues," concluding that injunctive relief is not "reasonably necessary to protect the Board's power to remedy the harm from the unfair labor practices once a

final administrative decision is issued," *id.* at 21). The majority further reveals its error when it notes that "Voith persuasively argues [that] there is no reason to believe in this case that the denial of interim injunctive relief will allow support for the Teamsters to erode to the point that the Board will be unable to adequately remedy the harm resulting from the alleged unfair labor practices." *Id.* at 21. Whether or not Voith may have the better argument, it is a *district court*'s role to make this determination. Once the majority determined that the district court's ruling was based on an incorrect understanding of the law and that the district court failed to determine whether interim injunctive relief was just and proper—that is, failed to answer the majority's critical question—the majority should have concluded its inquiry. After all, discretion exercised under an erroneous understanding of the law is an abuse of discretion. *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir. 1995) (noting that "a challenge to the grant or denial of a preliminary injunction under the abuse of discretion standard" will succeed when "the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard" (internal quotation marks omitted)).

The majority's conclusion is especially unfortunate. It plainly states that the majority "examin[ed] whether interim relief would be just and proper *in the first instance*." Maj. Op. at 21 (emphasis added). Such an examination was necessary because the district court failed to perform the analysis. This failure was legal error and an abuse of discretion. The majority oversteps our role as circuit judges by performing this analysis itself. It is the role of a district judge to determine from evidence presented and findings made whether § 10(j) injunctive relief would be just and proper. I would hold that the district court has abused its discretion, vacate the district court's judgment, and remand with instructions to perform the "just and proper" analysis.

For these reasons, I respectfully dissent.