**Joseph F. FRANKL, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**ADAMS & ASSOCIATES, INC., Respondent.**

**No. 2:14–cv–02766–KJM–EFB.**

United States District Court, E.D. California.

Signed Feb. 9, 2014.

Filed Feb. 10, 2015.

Joseph Doolin Richardson, Christy Jiwon Kwon, Jill H. Coffman, National Labor Relations Board, San Francisco, CA, for Petitioner.

Matthew J. Ruggles, Littler Mendelson, Sacramento, CA, Michael Gayland Pedhirney, Littler Mendelson, San Francisco, CA, for Respondent.

## ORDER

KIMBERLY J. MUELLER, District Judge.

This matter is before the court on the petition by Joseph F. Frankl, Regional Director of Region 20 of the National Labor Relations Board ("NLRB" or "Board"), for temporary relief under 29 U.S.C. § 160(j), pending resolution of petitioner's unfair labor practices claim before the Board. (Pet. for Inj., ECF No. 1.) Respondent Adams & Associates, Inc. ("Adams" or "respondent") opposes the motion. (Resp't Opp'n, ECF No. 17.) The court held a hearing on January 23, 2015, at which Joseph Richardson appeared for petitioner and Michael Pedhirney appeared for respondent. As explained below, the court GRANTS the motion.

## I. BACKGROUND

### A. Regulatory Framework

An understanding of the regulatory framework and the administrative process of unfair labor-practice adjudications informs the court's decision on petitioner's motion for an injunction. Section 7 of the National Labor Relations Act ("NLRA") guarantees employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8 prohibits employers from engaging in "unfair labor practices," including interfering with, restraining, or coercing employees in the exercise of their section 7 rights, id. § 158(a)(1), and prohibits employers from discriminating against employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," id. § 158(a)(3).

The NLRA also empowers the NLRB to adjudicate labor disputes, including "unfair labor practices" charges filed by private parties. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). "[T]he process of adjudicating unfair labor practice cases begins with the filing by a private party of a 'charge.'" Id. (citations omitted). Then

the NLRB's Office of General Counsel investigates the charge and decides whether a "complaint" should be filed. *See id.* at 138–39, 95 S.Ct. 1504. As a practical matter, the General Counsel has delegated the initial determination of whether to issue a complaint to NLRB Regional Directors. 29 C.F.R. §§ 101.8, 102.10. Petitioner here is the Regional Director for Region 20, which includes Northern California.

Once a complaint has been filed, an Administrative Law Judge ("ALJ") presides over a formal trial and files a decision. If no timely exceptions to the ALJ's decision are filed, the ALJ's decision automatically becomes the decision of the Board; otherwise, the Board will review and decide whether there has been an unfair labor practice. The Board's decision may then be enforced by, or appealed to, a federal court of appeals. *Id.* §§ 101.10–101.12.

It "takes considerable time—sometimes years—for the administrative process to conclude." *Frankl v. HTH Corp.* (*HTH Corp. I*), 650 F.3d 1334, 1340 (9th Cir. 2011). "As a result of 'the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals it may be possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible for the Board to restore the status quo." *Id.* (internal alteration and quotation marks omitted) (quoting S.Rep. No. 80–105, at 27 (1947)). The NLRA was amended to include section 10(j) to remedy this problem. *Id.*

Importantly for a decision on the pending motion, section 10(j) of the NLRA, 29 U.S.C. § 160(j), empowers the NLRB to apply to a federal district court for temporary injunctive relief once a complaint has issued asserting that a company is engaging in an unfair labor practice. In

this case, on June 10, 2014, the Sacramento Job Corps Federation of Teachers, AFT Local 4986 ("Union"), filed a charge with the NLRB, alleging respondent engaged in unfair labor practices in violation of section 8(a)(1), (3), and (5) of the NLRA. (ECF No. 1 at 2.) Subsequently, the Union amended this charge twice. (*Id.*) On October 1, 2014, the Union filed a second charge, alleging further violations of the NLRA. (*Id.*) Both charges were referred to petitioner Regional Director, who, upon investigation, issued an amended consolidated complaint against respondent. (*Id.* at 3.) At hearing, petitioner's counsel clarified that the Board approved the complaint. Also at the time of the hearing on the instant motion, the parties notified the court that a hearing was scheduled before the ALJ on January 26, 2015. As of the date of this order, the parties have not provided any further information on the outcome of that hearing.

### B. Facts Likely to Be Proven

The court notes at the outset that, "[i]n a § 10(j) case, the district court is not the ultimate fact-finder, but merely determines what facts are 'likely to be proven' to determine if the standard for an injunction has been met." *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 71 n. 2 (1st Cir.2001) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 25 (1st Cir.1986)). The following factual background is drawn from petitioner's and respondent's submitted evidence, and the court has weighed the evidence only to the extent necessary to determine the facts "likely to be proven" with respect to the requested injunction. *Id.*

Respondent operates youth and children's programs for governmental agencies and has operated at the Sacramento Job Corps Center ("Center") since March 2014. (Gagnon Decl. ¶¶ 3, 5, ECF No. 17–

7.) Specifically, respondent is responsible for the residential, counseling, career, preparation, career transition, and wellness services functions at the Center. (*Id.* ¶ 5.) Genesther M. Taylor ("Ms. Taylor"), the individual at issue in the complaint, worked as a Resident Advisor ("RA") at the Center from August 2008 to March 2014. (Taylor Aff. at 24, ECF No. 7–3.) At the time Ms. Taylor began working at the Center, her employer was Horizons Youth Services ("Horizons"), respondent's predecessor. (*Id.*) Ms. Taylor became the president of the Union approximately four years ago, in or about 2011. (*Id.* at 2.)

Before starting its operation at the Center, respondent initiated various activities to facilitate the transition from Horizons to respondent. (Gagnon Decl. ¶ 8, ECF No. 17–7.) With that purpose, respondent's Executive Director, Jimmy Gagnon ("Mr. Gagnon"), visited the Center in February 2014 to conduct interviews for the Deputy Center Director position, the highest-ranking position at the Center. (*Id.*) After conducting interviews, Mr. Gagnon hired Kelly McGillis ("Ms. McGillis") as the Deputy Center Director. (*Id.*) Because respondent had a short period within which to conduct interviews for open positions, it had "several representatives at the site to conduct job interviews, including Mr. Gagnon, Ms. McGillis, respondent's then-Human Resources Director Valerie Weldon, and six other individuals. (*Id.* ¶ 12.) While Mr. Gagnon was the final decision-maker as to whom to hire, he "relied heavily on the feedback of the interviewers." (*Id.*)

Before conducting interviews, respondent's managers consulted with Horizons' managers about the qualifications of potential employees. (ECF No. 7 at 6–7.) One of Horizons' managers with whom Ms. McGillis consulted was Residential Manager Lee Bowman. (Bowman Decl. ¶¶ 5–7, ECF No. 17–8.) Based on her consulta-

tion, Ms. McGillis signed a form entitled "Justification for Disqualification of Potential Employment" for Ms. Taylor on February 27, 2014, the day before Ms. Taylor's interview date. (McGillis Decl. ¶ 14, ECF No. 17–3.) That form, in relevant part, provides: "Genesther Taylor is not eligible and/or qualified to [sic] an offer of employment with Adams and Associates, Inc., . . . for the following reason[ ]: Adams has a reason to believe, based upon written credible information from a knowledgeable source, that this employee's job performance while working on the current contract has been unsuitable." (ECF No. 7–3 at 97.)

Respondent began interviewing applicants for the RA positions on February 27, 2014. (ECF No. 7 at 7; ECF No. 7–3, Ex. 5.) Respondent documented each interview with an Interview Evaluation Form, on which the interviewer graded an applicant with a numerical score between one and four in nine categories, with a score of one being the best. (ECF No. 7–3, Ex. 5.) Ms. Taylor interviewed with Ms. McGillis for an RA position on February 28, 2014. (McGillis Decl. ¶ 16, ECF No. 17–3.) Ms. McGillis recorded her impressions of Ms. Taylor on an Interview Evaluation Form and a File Note. (ECF No. 7–3 at 92–97.) Respondent did not extend Ms. Taylor a job offer. (Gagnon Decl. ¶ 15, ECF No. 17–7.) It did, however, hire the Union's Vice President, Charles King, and Shop Steward, Sheila Broadnax. (ECF No. 17 at 16 n. 12.)

## II. *STANDARD*

■ Section 10(j) authorizes a district court to grant injunctive relief "it deems just and proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding

whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC,* 593 F.3d 950, 957 (9th Cir.2010).

 A court may issue a preliminary injunction to preserve the relative positions of the parties pending a trial on the merits. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). The party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or "serious question" test, which allowed a court to balance the elements of the test "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir.2011). Recently, the Circuit found that its sliding scale test survived *Winter:* a court may issue a preliminary injunction when a petitioner raises serious questions going to the merits and demonstrates that the balance of hardships tips sharply in his favor, so long as the court also considers the remaining two prongs of the *Winter* test. *Id.* at 1135. However, a court need not reach the other prongs if the moving party cannot as a threshold matter demonstrate a "fair chance of success on the merits." *Pimentel v. Dreyfus,* 670 F.3d 1096, 1111 (9th Cir.2012) (internal quotation marks omitted).

 "In all [NLRA] cases, however, the Regional Director must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *HTH Corp. I,* 650 F.3d at 1355. Moreover, the court "must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power." *Id.*

 A district court's grant of a § 10(j) preliminary injunction will be reversed "only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.*

## A. Likelihood of Success on the Merits

 "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred" and that a federal court of appeals "would grant a petition enforcing that order, if such enforcement were sought." *HTH Corp. I,* 650 F.3d at 1355. In making this determination, the court must "factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 460 (9th Cir.1994). Accordingly, "the regional director in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.'" *HTH Corp. I,* 650 F.3d at 1356. "But if the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor," as well as the other equitable elements for preliminary injunctive relief. *Id.* (citing *Alliance for the Wild Rockies,* 632 F.3d at 1135).

Moreover, in this case, the court accords "the Regional Director special deference because the Board took the rare step of

endorsing the Director's Section 10(j) petition." *Frankl ex rel. NLRB v. HTH Corp.* (*HTH Corp. II* ), 693 F.3d 1051, 1062 (9th Cir.2012). Deference is warranted here because the Board's endorsement may "signal [its] future decision on the merits, assuming the facts alleged in the petition withstand examination at trial." *Id.* (quoting *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1187 (9th Cir.2011)).

Petitioner contends respondent has engaged in unfair labor practices in violation of the NLRA in two ways: (1) respondent did not hire Genesther Taylor ("Ms. Taylor") because of her union activities; and (2) respondent unlawfully barred Ms. Taylor from its property. (ECF No. 7–2 at 1–2.) Petitioner asks this court to grant interim injunctive relief under section 10(j) of the NLRA, ordering respondent to (1) restore Ms. Taylor to her former position, or if the position no longer exists, then to a substantially equivalent position; and (2) rescind respondent's rule barring her from the property. (*Id.* at 3.)

Respondent counters Ms. Taylor was not hired because she was not qualified. (ECF No. 17 at 6–9.) As to Ms. Taylor's access to the center, respondent counters petitioner's request is moot because "Ms. Taylor is now permitted to come on to the site for bargaining and other purposes." (*Id.* at 25–26.)

### 1. Respondent's Decision not to Hire Ms. Taylor

Petitioner argues there is a strong likelihood he will prove respondent unlawfully refused to hire Ms. Taylor because of her position as the Union president and because of Union related activities. (ECF No. 7–2 at 16.)

Section 8(a)(3) of the NLRA prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). A new owner cannot refuse to hire its predecessor's employees solely because of their union membership. *Scott on Behalf of N.L.R.B. v. Pac. Custom Materials, Inc.,* 939 F.Supp. 1443, 1452 (N.D.Cal.1996). In a section 8(a)(3) case, such as this, the Board uses the burden-shifting scheme articulated in *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), to determine whether an employer was motivated by anti-union animus. *Healthcare Employees Union, Local 399, Affiliated With Serv. Employees Int'l Union, AFL–CIO v. N.L.R.B.,* 463 F.3d 909, 919 (9th Cir.2006). Under *Wright Line,* petitioner must "make a prima facie showing sufficient to support the inference" antiunion animus "was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct." *Healthcare Emps. Union,* 463 F.3d at 919 (quoting *Wright Line,* 251 N.L.R.B. at 1089). Although petitioner retains the ultimate burden of persuasion before the Board itself, "once the General Counsel establishes that antiunion animus was a motivating factor, the employer bears the burden of establishing ... the inevitability of termination." *Schaeff Inc. v. NLRB,* 113 F.3d 264, 267 n. 5 (D.C.Cir.1997). "In establishing its *Wright Line* defense, the employer is free to show, for example, that it did not hire particular employees because they were not qualified for the available jobs, and that it would not have hired them for that reason even in the absence of the unlawful considerations. Similarly, the employer is free to show that it had fewer unit jobs than there were unit employees of the predecessor." *Planned Bldg. Servs., Inc.,* 347 N.L.R.B. 670, 674 (2006).

 Because the "employer will seldom admit that it was motivated by anti-union animus," "circumstantial evidence is sufficient to establish anti-union" animus was a motivating factor in the decision to terminate an employee. *Healthcare Emps. Union,* 463 F.3d at 919. Indicia that support an inference that anti-union animus was a motivating factor in the termination of an employee include: (i) the employer's knowledge of the employee's union activity, (ii) the employer's "antipathy toward" union activity, and (iii) "the timing of the adverse employment action." *E.C. Waste, Inc. v. NLRB,* 359 F.3d 36, 42–43 (1st Cir.2004); *accord Healthcare Emps. Union,* 463 F.3d at 919–20.

 After carefully considering the parties' arguments and the evidence in the record, as discussed below, the court finds the evidence petitioner has presented sufficient to establish its likelihood of success on the merits. It is undisputed that respondent did not hire Ms. Taylor. Thus, the sole question is whether that decision was motived by antiunion animus.

First, petitioner is likely to show respondent's knowledge of Ms. Taylor's Union position and activities. Mr. Gagnon states that Ms. Taylor informed him during three meetings before the interview that she was the Union President. (Gagnon Aff., ECF No. 7–3 at 76.) In addition, Mr. Gagnon states he interacted with Ms. Taylor on two other occasions before the completion of the hiring. (*Id.*) On one occasion, before respondent had completed its hiring, Ms. Taylor went to the transition office and requested descriptions of available jobs. (*Id.*) On another occasion, "as [respondent] was making decisions whether or not to hire," Ms. Taylor inquired about "a hiring decision on another employee." (*Id.*) Respondent did not respond to Ms. Taylor's inquiry. (*Id.*) Respondent's knowledge of Ms. Taylor's union membership is further corroborated by Ms. McGillis. (*Id.* at 98.) Ms. McGillis states that when she interviewed Ms. Taylor, she "was aware that [Ms. Taylor] was the Union President" because Ms. Taylor informed her during the interview about her involvement with the Union and Ms. McGillis "may have known it before then." (*Id.* at 102.) Hence, there is sufficient evidence of respondent's knowledge of petitioner's union activities.

Second, petitioner is likely to show respondent's decision was motivated by antiunion animus. For example, on her interview note, Ms. McGillis commented, with no explanation, that when Ms. Taylor went to the transition office, her "behavior was found to be inappropriate and quite demanding." (*Id.* at 115.) Ms. Taylor provides a different explanation of her first visit to the transition office. On February 14, 2014, she went to the transition office and asked to speak with Mr. Gagnon. (*Id.* at 26.) But because Mr. Gagnon was unavailable, Ms. Taylor asked another person in the office to "pass on to Gagnon that in [her] capacity as Union President, [she] needed a copy of all documentation handed to the [RAs]." (*Id.*) Ms. Taylor never received those documents. (*Id.*) The Board can reasonably find that what Ms. McGillis refers to as "inappropriate and quite demanding" behavior was Ms. Taylor exercising her authority, as the Union President, to act for all Union members. *See Bruce Packing Co., Inc.,* 357 N.L.R.B. No. 93, at *18 (Sept. 28, 2011) (noting "accusing an employee of having a 'bad attitude' has long been considered a veiled reference to the employee's protected concerted activities"); *Promenade Garage Corp.,* 314 N.L.R.B. 172, 179–80 (1994) (an employer's complaint about an employee's "work attitude" is "an euphemism for a prounion attitude"); *Cook Family Foods,* 311 N.L.R.B. 1299, 1319 (1993) (company manager's reference to employee's "bad atti-

tude" deemed, in context, to be a reference to union activities); *McCotter Motors Co.*, 291 N.L.R.B. 764, 771 (1988) (manager told employee she had "bad attitude" after she voiced grievances on behalf of other employees, which was deemed evidence of unlawful motive in her subsequent discharge).

The Board may also find Ms. McGillis's comment about Ms. Taylor's interview date is additional circumstantial evidence of antiunion animus. Ms. McGillis found it "odd and concerning" that Ms. Taylor interviewed "on the last day for incumbent applicants to apply." (ECF No. 7–3 at 115.) Respondent does not explain, and it is unclear to this court, why the date of Ms. Taylor's interview was relevant to respondent's decision not to hire when respondent's purported reason for not hiring Ms. Taylor was that she was unqualified. Ms. McGillis's comment raises a red flag because respondent did not announce any deadlines for employees to complete their interviews (ECF No. 7–3 at 33–34); respondent was responsible for scheduling the interviews, not the applicants; and Ms. McGillis interviewed and recommended for hire other RA applicants who interviewed on or after the date of Ms. Taylor's interview (*see* ECF No. 7–3 at 147–48, 150, 151, 152, 154, 156, 159, 164–67). *See U.S. Marine Corp.*, 293 N.L.R.B. 669, 670 (1989) (an unlawful refusal to hire may be shown by "lack of a convincing rationale for refusal to hire the predecessor's employees; [and] inconsistent hiring practices ... evidencing a discriminatory motive").

Ms. McGillis's characterization of Ms. Taylor's description of the challenges she faced while working as an RA may provide further circumstantial evidence of animus. Specifically, in the interview note, Ms. McGillis states that during the interview, Ms. Taylor "expressed having a challenge and expressed being overwhelmed with the number of students in her charge (38) ...

[and] she had a hard time keeping up with her duties." (ECF No. 7–3 at 115.) Those comments are inconsistent with Ms. McGillis's own documentation and are contradicted by Ms. Taylor. For instance, on the interview evaluation form, Ms. McGillis identified the number of students in the dorm as 23 and not 38. (*Id.* at 114.) Further, while Ms. Taylor said "some of the students could be challenging," she specified that she "maintained [her] professionalism with them." (*Id.* at 34.) She "never said that [she] had trouble handling [her] dorm." (*Id.*)

Ms. McGillis also wrote on the interview note that Ms. Taylor "stated that she was not interested in any other positions except for [RA]" (*id.* at 115), and also noted on the interview evaluation form that Ms. Taylor was not interested in a supervisory position (*id.* at 114). Ms. McGillis "thought the Resident Coordinator position might be a better fit for [Ms. Taylor] ... because [Ms. McGillis] wanted ... to increase [Ms. Taylor's] chances of being hired by applying for more positions." (*Id.* at 101–02.) However, Ms. McGillis's explanation is inconsistent with the Disqualification Form, which was prepared before the interview and provides Ms. McGillis is ineligible for employment with respondent. (*Id.* at 109.) In addition, Ms. Taylor states that when Ms. McGillis asked her why she only applied for the RA position, Ms. Taylor responded she "could not go for another position because [she] was the Union President and [she] wanted to maintain [her] presidency." (*Id.* at 34.) Petitioner's observation is correct: "the Board would reasonably interpret McGillis's observation that [Ms. Taylor] was not interested in a supervisory position as a shorthand reference to [her] desire to remain Union President and to stay in the bargaining unit." (ECF No. 7 at 21.)

In these circumstances, the court finds petitioner has met his burden of making a prima facie showing sufficient to support the inference that antiunion animus was a motivating factor in respondent's decision. Accordingly, the ·burden shifts to respondent to demonstrate the same action would have taken place even in the absence of protected conduct. To overcome the prima facie showing, the employer bears the burden of persuasion. *Scott on Behalf of N.L.R.B.*, 939 F.Supp. at 1453. Here, the court finds respondent has not rebutted petitioner's prima facie case.

Respondent asserts that Ms. McGillis did not recommend Ms. Taylor for hiring "largely based upon Ms. Taylor's representation that she believed that supervising twenty-three sleeping students during the graveyard shift in which the students were sleeping was a 'harrowing' experience." (ECF No. 17 at 16.) Respondent further argues "Ms. McGillis believed that during the interview, Ms. Taylor did not provide Ms. McGillis with any strong sense of her accomplishments, leadership skills, or her interpersonal skills." (*Id.*) As evidence that Ms. Taylor described her experience of being responsible for twenty-three students "harrowing," respondent submits Ms. McGillis's declaration. (ECF No. 17–3 at 2–10.) It provides as follows:

> I found this troublesome because Ms. Taylor worked the graveyard shift for Horizon [sic], during which the students were asleep for the most part. Unlike Horizon, Adams's model was to assign each [RA] sixty students. If Ms. Taylor believed that it was "harrowing" to supervise twenty-three students who were sleeping, she would be even more overwhelmed supervising sixty students.

(McGillis Decl. ¶ 18, ECF No. 17–3.)

As noted above, however, petitioner has introduced sufficient circumstantial evidence, and respondent cannot defeat petitioner's showing simply by presenting conflicting evidence. *HTH Corp. II*, 693 F.3d at 1063 ("Conflicting evidence in the record 'does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction.'" (internal quotation marks omitted)). In addition, respondent has not explained how Ms. Taylor was not qualified for the RA position when she had been working as an RA for six years before respondent began operating at the Center. (Taylor Aff. at 23, ECF No. 7–3.)

The court finds petitioner has demonstrated a likelihood of success on the merits of the unfair labor practice claim at issue. Petitioner has, at the very least, presented some evidence and an arguable legal theory to support its position. *See HTH Corp. II*, 693 F.3d at 1063.

2. Limitation on Access to Center

The court need not analyze petitioner's second basis for relief in depth, in light of its granting the request for Ms. Taylor's instatement. *See Souza v. California Dep't of Transp.*, No. 13–04407, 2014 WL 1760346, at *6 (N.D.Cal. May 2, 2014). Respondent previously has given Ms. Taylor access to the Center for the purpose of representing union members in grievance proceedings and other union-related matters, including collective-bargaining sessions that occur there. While respondent suggests its voluntary action moots petitioner's request for full access, it has imposed an advance notification condition on Ms. Taylor's access. (ECF No. 17 at 25–26.) If Ms. Taylor accepts the instatement offer, she will presumably have access to the Center generally in connection with her work, without the requirement of providing advance notice. So that her ability to access the Center is unimpeded for all purposes relevant to petitioner's motion, the court grants the requested access provision as well.

### B. Irreparable Harm

In the section 10(j) context, "irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *HTH Corp. I*, 650 F.3d at 1362. "[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Excel Case Ready*, 238 F.3d at 74 (internal quotation marks and alteration omitted). "Moreover, the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)." *Id.* at 75. Accordingly, the Ninth Circuit has held "a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations … largely establishes likely irreparable harm, absent unusual circumstances." *HTH Corp. I*, 650 F.3d at 1363.

Here, as previously discussed, petitioner has shown a likelihood of success on the merits as to a section 8(a)(3) violation, which "establishes likely irreparable harm, absent unusual circumstances." *Id.* at 1163. For example, Ms. Taylor affirms that "the number of confirmed members in the bargaining unit has decreased to only two from about twenty or so," (ECF No. 17-3 at 38–39). *See Excel Case Ready*, 238 F.3d at 74 (the chilling effect on unionization and collective bargaining is important harm). In addition, at the hearing, the parties represented to the court that the Union and respondent have yet to reach an agreement on contract terms.

Moreover, respondent's argument that petitioner's delay in filing the § 10(j) petition "weakens [the] claim that irreparable harm will occur in the absence of a preliminary injunction" is unpersuasive. (ECF No. 17 at 22.) Here, Ms. Taylor learned about respondent's decision not to hire her in March 2014; the Union filed its first charge on June 10, 2014; the Board issued an amended consolidated complaint on November 24, 2014; and petitioner filed the § 10(j) petition on November 25, 2014. (ECF No. 1.) This timeline reflects the reality that the Board must have sufficient amount of time to investigate the charge before filing a petition for injunction. At the hearing, petitioner's counsel confirmed the timeline was consistent with the NLRB guidelines. *See HTH Corp. I*, 650 F.3d at 1363; *Reichard v. Foster Poultry Farms*, 425 F.Supp.2d 1090, 1101 (E.D.Cal. 2006) (five-month passage of time; "[d]elay in the federal bureaucracy is an unfortunate ramification of the operation of government"); *see also Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (eighteen-month passage of time not a bar to injunction); *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir.2009) (same).

Accordingly, the court finds that petitioner has shown irreparable harm will likely result in the absence of interim relief.

### C. The Balance of Hardships and Public Interest

The Ninth Circuit has held that a district court's determination that the "Regional Director had shown likely irreparable harm to the collective bargaining process meant that there was also considerable weight on his side of the balance of the hardships." *HTH Corp. I*, 650 F.3d at 1365. Likewise, if "the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Id.*

Here, for the reasons stated above, the Regional Director has shown that the unfair labor practice claim will likely succeed

and that irreparable harm is likely to result; the balance of hardships and the public interest thus support granting interim relief.

Moreover, respondent's argument, that "instating Ms. Taylor would ... unjustly injure Adams" because it "will necessarily require Adams to terminate a qualified [RA]," is unavailing (ECF No. 17 at 24). *See Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.,* 853 F.2d 744, 750 (9th Cir.1988) (noting "the rights of the employees who were discriminatorily discharged are superior to the rights of those whom the employer hired to take their places"), *overruled on other grounds by Miller,* 19 F.3d at 457. In addition, the disproportionate impact of not hiring Ms. Taylor, given her leadership position and the small size of the bargaining unit at the Center, also weighs in favor of finding the balance of hardship factor favors petitioner. (ECF No. 7–3 at 127.) Finally, the public interest factor weighs in favor of injunction because it is necessary to prevent an alleged unfair labor practice from succeeding due to delay in the administrative process. *See HTH Corp. I,* 650 F.3d at 1365 (noting "the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge"). Accordingly, the injunction promotes the public interest by preserving the NLRB's remedial power, and the balance of hardships favors injunctive relief. *See id.* Therefore, the court finds that injunctive relief is in the public interest, and the balance of hardships favors granting petitioner's request for interim relief.

Accordingly, the court GRANTS petitioner's request.

## III. *MOTION TO STRIKE*

Also pending before the court is respondent's motion to strike. (ECF No. 21.) Respondent requests that this court strike: (1) the transcript of Valerie Weldon's interview ("Weldon deposition"); (2) the Second Amended Complaint filed by petitioner; and (3) all portions of the reply brief filed by petitioner that refer to the Weldon deposition and to the Second Amended Complaint. (*Id.* at 1.) Respondent argues the court should grant its motion "because the Region presented this evidence for the first time, in connection with its Rebuttal Memorandum, thereby depriving Adams the opportunity to address such evidence in its Opposition." (*Id.*)

The court need not address this motion because, in deciding petitioner's motion for temporary relief, the court does not rely on the new facts introduced, for the first time, with petitioner's reply. *See Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir.2007) ("[D]istrict court need not consider arguments raised for the first time in a reply brief.").

## IV. *EVIDENTIARY OBJECTIONS*

Concurrent with its opposition brief, respondent has filed evidentiary objections to certain parts of Ms. Taylor's affidavit. (*See* ECF No. 17–1.) The court need not address those objections because it does not rely on the parts of Ms. Taylor's affidavit to which respondent objects in deciding what facts are likely to be proven for purposes of the instant temporary relief.

## V. *CONCLUSION*

For the foregoing reasons, the court finds that injunctive relief is "just and proper," 29 U.S.C. § 160(j), and the Regional Director's petition for temporary relief is GRANTED.

The court HEREBY ORDERS respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys, and all persons acting on its behalf or in participation with it to take the fol-

lowing steps pending the final disposition of the matter:

 a. Offer Genesther Taylor immediate instatement to the job position which she previously held with her predecessor employer Horizons, or to a substantially equivalent position if her position no longer exists, without prejudice to Taylor's rights and privileges, displacing, if necessary, any newly hired outside applicants;

 b. Permit Genesther Taylor access to the Sacramento Job Corps Center for the purpose of representing union members in grievance proceedings and other union-related matters (such as collective-bargaining sessions) that occur there;

 c. Within fourteen (14) days of the date of this Order, post copies of the District Court's Order at the Sacramento Job Corps Center located in Sacramento, California, in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement; and

 d. Within twenty-one (21) days of the issuance of this order, file with the court and serve upon the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which respondent has complied with the terms of the Order, including the locations of the posted documents.

The court ADDITIONALLY ORDERS that no later than seven (7) days after the ALJ issues the final recommendation, the parties shall file a Joint Status Report with the court briefly setting forth the decision of the ALJ and the schedule for further proceedings before the Board.

IT IS SO ORDERED.